# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, ) ) ) | |
| Plaintiff, ) ) ) | Case No.: 2:06-cv-01225-RCJ-PAL |
| vs. ) ) | |
| GNLV CORP., d/b/a GOLDEN NUGGET HOTEL AND CASINO, and DOES 1–10, Inclusive, ) ) ) ) | **ORDER** |
| Defendants. ) ) | |

This employment discrimination case is on remand from the Ninth Circuit Court of Appeals. Previously, this Court granted Defendant's motion for summary judgment on Plaintiff's claims that Defendant harbored a pattern or practice of racial and sexual discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"). (ECF No. 110). Because it granted summary judgment in Defendant's favor as to the pattern-or-practice allegations, the Court found that the claims of the six individual employees were moot. (*Id.* at 4). On appeal, the Ninth Circuit affirmed the pattern-or-practice ruling but held that the ruling regarding the merits of the individual employees' claims was in error, reasoning that "[a] judgment in favor of an employer on a class-wide pattern-or-practice claim does not preclude class members from bringing individual discrimination claims." (Ninth Circuit Op. 2, ECF No. 137, at 2).

The Court now rules on Defendant's individual motions for summary judgment related to the merits of each separate employee's claims of racial or sexual discrimination. (ECF Nos. 63, 64, 65, 66, 68, 70).  Also before the Court are the U.S. Equal Employment Opportunity Commission's ("EEOC") responses to Defendant's motions on behalf of each employee, (ECF Nos. 78, 79, 81, 82, 83, 85),  and Defendant's replies to each of the EEOC's responses, (ECF Nos. 97, 98, 99, 102, 104, 105).

## I.   PROCEDURAL HISTORY AND FACTS

The procedural history of this case applies equally to each of the six individual employee claimants. In September 2006, the EEOC sued Golden Nugget Las Vegas ("GNLV") on behalf of Robert Royal and a class of similarly situated individuals employed by GNLV on the basis of racial and sexual harassment and retaliation under Title VII.  The charging party, Royal, and several other individuals allege that GNLV engaged in a pattern or practice of condoning and tolerating racial and sexual harassment and retaliation directed at its employees.  The EEOC's theory is that GNLV created and maintained a sexually and racially hostile work environment because it tolerated individual acts of sexual and racial harassment both by its employees and by customers. The EEOC also alleges that GNLV refused to take notice of, investigate, or discipline workers or customers who subjected its employees to sexual or racial harassment.  GNLV moved for summary judgment on the pattern-or-practice allegations in December 2008, (ECF No. 61), and Judge Brian E. Sandoval granted the motion.  Judge Sandoval concluded that the EEOC provided insufficient evidence that Royal and the other GNLV employees were subjected to a general pattern or practice of harassment or discrimination, rendering the individual employees' claims moot. (ECF No. 110)  The Ninth Circuit agreed with the pattern-or-practice ruling but disagreed that the individual employees' claims were moot and remanded the case so that this Court could determine whether to grant summary judgment as to the individual employees'

claims. The individual employees allege various instances of employment discrimination that the Court will now summarize.

### A. Robert Royal

Royal, an African-American, was hired to work at the Golden Nugget as a games dealer in September of 1998. (Royal Dep. 66:22–25, May 7, 2008, ECF No. 76-2) ("VI Royal Dep."). He remained employed there until February 2008 when he voluntarily left to attend barber school in Arizona. (Royal Dep. 99:22–100:12, May 8, 2008, ECF No. 76-21) ("VII Royal Dep."). Royal alleges that during his employment he was subjected to a hostile work environment arising from racial discrimination and retaliation. Royal identifies certain incidents with customers, co-workers, and supervisors that the EEOC argues are supportive of his allegations.  In 1999, a customer used the word "nigger" in Royal's presence, although Royal is unsure whether it was directed at him. (VI Royal Dep. 166:4–167:6).  Royal reported the customer and the floor manager on duty forced the customer to leave. (*Id.* at 169:3–10).  Between 1999 and 2002, a customer used the term "blackie" as he was leaving the table where Royal was dealing. (*Id.* at 171:12–172:14).  However, Royal did not report this incident to any supervisor. (*Id.* at 172:15–18).  Royal also alleges that a customer once told him, "I'll kick your black ass." (*Id.* at 171:1, 182:10–18).  The statement was made by a customer who was losing money in the game and was leaving Royal's table, and Royal did not report the incident to anyone. (*Id.* at 182:22–183:22).

Royal allegedly heard other egregious comments directed towards him by customers.  In 2002, two white men were playing a three-card poker game at Royal's table when one of the men began talking about "playing craps with these two niggers . . . and them black son of bitches sure could shoot some dice." (*Id.* at 219:6–13).  The man refused to apologize for his language and Royal called his floor supervisor. (*Id.* at 219:21–25).  While Royal was explaining what happened to the floor supervisor, the men left the table and they did not play at Royal's table

1   again. (*Id.* at 221:1–22).  Another incident stands out to Royal in which he was called vulgar

2   names by customers, including "cocksucker" and "nigger." (*Id.* at 184:11–16).  Royal estimates

3   that he heard the word "nigger" directed at him or others five to ten times during his employment

4   at GNLV. (*Id.* at 232:15–233:1).

5        Royal also alleges that his co-workers and supervisors used racially demeaning language.

6   In 2006, a co-worker told customers at Royal's table on two different occasions that "once you

7   give it to a black, you'll never get it back."  (*Id.* at 293:15–294:9).  The co-worker would then

8   grab Royal's buttocks. (*Id.* at 294:14–25).  This incident was investigated by GNLV and the

9   co-worker was eventually terminated, though not solely for his actions against Royal. (*Id.* at

10  298:21–299:5).  Royal claims that on two separate occasions, two different supervisors made the

11  comment to others that "all blacks look alike." (*Id.* at 305:8–20).  After the first occurrence,

12  Royal immediately reported the incident and Royal's superiors addressed the issue by speaking

13  to the supervisor about his racial remarks. (*Id.* at 306:25–308:3).  The second time a supervisor

14  made this remark Royal did not report the incident to anyone at GNLV. (*Id.* at 309:21–310:12).

15  Royal alleges that another supervisor made racial jokes on two different occasions, but that the

16  jokes were not about "blacks." (*Id.* at 311:4–21).  Royal did not report this incident either; he

17  believed it would not change the supervisor's behavior. (*Id.* at 314:9–14).

18        Royal further alleges that the Golden Nugget retaliated against him.  Royal submitted a

19  letter dated July 12, 2002 to GNLV's Human Resources Manager regarding an incident during

20  which customers directed racial epithets at him. (Pl.'s Resp. to Def.'s First Set of Req. for

21  Admis. ¶ 16, ECF No. 63-2).  Thereafter, the EEOC claims that Royal was subjected to a pattern

22  of disciplining that he felt was retaliatory, including Royal's suspicions that GNLV was

23  encouraging customers to submit complaints about him. (VII Royal Dep. 47:17).  The EEOC

24  also identifies a situation in which Royal was suspended for a day after calling a customer a

vulgar name. (*Id.* at 82:9–16).  Royal alleges that the suspension was an extreme measure, though he does not remember any other dealer directing that particular type of vulgarity towards a customer. (*Id.* at 82:13–25).  Despite these allegations, Royal never experienced a pay decrease or the denial of benefits, requests for time off, or requests for a leave of absence during his employment at the Golden Nugget. (*Id.* at 91:8–92:15).

### B.  Susie Fein

GNLV hired Susie Fein in November 1999 as a blackjack dealer. (Fein Dep. 37:18–20, 38:18–20, May 12, 2008, ECF No. 76-34). Fein's employment was terminated in September 2002. (*Id.* at 39:2–7). Fein complains that she suffered sexual harassment at GNLV and alleges she was retaliated against for reporting the harassment.

Fein claims she suffered sexual harassment from Ray Allen, an employee at GNLV with whom she previously had a personal relationship. (*Id.* at 48:22–49:14). Fein alleged that Allen "stalked" her, "star[ed] her down" at work, left a note in her pocket, left flowers on her car and "followed [her] around after work." (*Id.*). When Fein initially reported Allen's behavior to supervisor Jimmy Threet, Threet confronted Allen. (*Id.* at 50:18–51:4). While Allen's conduct outside of work stopped, his staring at Fein during work continued. (*Id.* at 51:8–13, 54:7–17). Fein alleges she complained again to Threet about Allen's staring, but nothing was done. (*Id.* at 53:11–54:6). Fein was dissatisfied with the way Threet handled her complaint. (*Id.* at 48:21–24).

Fein alleges she was sexually harassed by supervisor Dave Tuttle through his actions of touching her hair 20–30 times, inviting her to a cabin in Big Bear about five times, telling her "how nice [she] looked," and his "generally, just coming on to [her]." (*Id.* at 55:18–58:21).  Fein did not report Tuttle's behavior to anyone. (*Id.* at 59:10–19).

Fein also claims that one customer, "Mr. Martini," committed particularly bad acts of sexual harassment. She alleges that he kissed her on the lips about 20 times. (*Id.* at 74:15–22,

76:8–13). She is not sure any supervisors witnessed these incidents. (*Id.* at 76:18–22). Mr. Martini also called Fein a "fucking cunt" about five times. (*Id.* at 77:1–7). Fein alleges that supervisors Jimmy Threet overheard this comment at least once due to his close proximity to Fein's table. (*Id.* at 78:5–16). Fein also alleges that a supervisor named "Del" heard these comments. (*Id.* at 79:15–24). Mr. Martini also called Fein a "fucking bitch" about 100–200 times. (*Id.* at 80:22–25). Fein alleges that supervisors Jimmy Threet, Allan Joseph, Bobby Plutte, Robert Williamson, and Dave Tuttle heard these comments due to their proximity to Fein's table. (*Id.* at 81:9–82:16). Fein also claims that Robert Williamson addressed Mr. Martini's comments by instructing Fein to bring a tape recorder to work. (*Id.* at 85:7–15). Mr. Martini also, in a "hostile" manner, slapped Fein's hands from across the table. Fein further alleges that the same supervisors witnessed this behavior (*Id.* at 87:18–88:10). Last, Fein alleges that Mr. Martini threw cards at her on numerous occasions and believed her supervisors witnessed this conduct because of their proximity to Fein's workspace. (*Id.* at 94:1–13, 95:1–7).

Fein claims a customer named "Joe" called her a "fucking bitch" about 100 times. (*Id.* at 96:6–20, 97:11–13). Fein believes a supervisor named "Maurice" overheard these comments at least more than once and "did nothing" about it. (*Id.* at 97:8–10). Fein also alleges Joe threw cards at her about 25 times and believes her supervisors saw this conduct because of their proximity to her workspace. (*Id.* at 98:2–4, 98:10–12, 98:25–99:3). Fein also alleges that Joe would ask for dealers of certain ethnicities and gender, and that the supervisors would accommodate these requests. (*Id.* at 99:12–16, 99:23–100:1).

A third customer, "Mr. Hello" allegedly called Fein a "fucking bitch" about 10 times. (*Id.* at 101:14–16). Fein never sought assistance from her supervisors to address Mr. Hello's comments. (*Id.* at 101:17–20). Fein is not sure there were witnesses to Mr. Hello's comments but believes that her supervisors witnessed the conduct due to their proximity to her workspace. (*Id.*

at 101:21–102:10). Mr. Hello also threw cards at her about 10 times. (*Id.* at 105:19–106:4). Fein never reported these customers' behavior to Human Resources or Employee Relations. (*Id.* at 105:19–106:4).

Prior to Fein's termination in September 2002, she was reprimanded for attendance issues. Fein received a verbal warning in July 2002, a written warning in August 2002, and a one-day suspension in September 2002. (*Id.* at 108:21–109:11, 110:9–12, 111:14–23). At a due process hearing on her attendance issues, Fein submitted a document that she drafted that said "I love working at the Golden Nugget." (*Id.* at 134:15–136:8). Fein also mentioned anxiety and panic attacks she experienced at work at this hearing. (*Id.* at 136:12–15, 172:8–20). Fein was thereafter terminated from employment at GNLV in September 2002. (*Id.* at 39:2–7).

Fein encountered Supervisor David Tuttle in 2007 and claims he encouraged her to reapply for a position at GNLV. (*Id.* at 145:15–20). Fein claims she initiated the reapplication process, yet was never contacted for employment at GNLV. (*Id.* at 146:7–148:4, 148:22–149:21). Fein believes the reason she was not rehired was because of her participation in this lawsuit. (*Id.* at 148:5–10).

**C.  Ervin Nixon, Jr.**

GNLV hired Ervin Nixon, Jr. as a part-time table games dealer in November 2002. (Pl.'s Resp. Req. Admis., Set Three, ECF No. 65-3, at 3). Nixon is African-American. (Nixon Decl. ¶ 2, ECF No. 76-22).  Nixon alleges he suffered racial discrimination and retaliation while employed at GNLV.

Nixon first claims GNLV discriminated against him in the manner that work was assigned and shifts were scheduled. Nixon claims GNLV's casino department was segregated by race, precluding Nixon from working in the Dice Pit. (Nixon Decl. ¶ 8). Nixon further claims that other African-American dealers were not scheduled to work in the Dice Pit, a shift Nixon

considered to be the "most sought after." (*Id.*). Instead, Nixon worked at Table 25 for most of his time employed by GNLV, an assignment Nixon considered undesirable. (*Id.* ¶ 9). In the spring of 2003, Nixon complained to the Casino Manager Tommy Newman that he believed he was being discriminated against because he was black. (*Id.* ¶ 11). Nixon claims "nothing was done" in response to his complaint. (*Id.*). In January 2004, Nixon made a verbal complaint to supervisors Jack Brooks and Leonard Sina that only white dealers were assigned to work in the Dice Pit. (*Id.* ¶ 26). Brooks only observed minorities working at Table 25. (Nixon Dep. 126:2–4, ECF No. 65-2, at 22).

Nixon also complained to supervisors Leonard Sina and Art Fahey that other part-time dealers with less seniority than Nixon received more shifts than him. (Nixon Decl. ¶ 12). According to Nixon, "nothing was done" in response to his complaint. (*Id.*). In March 2003, Nixon complained to Tommy Newman about Sina not scheduling Nixon for more hours. (*Id.* ¶ 13). Nixon alleges that after he complained to Newman, Sina approached Nixon at Nixon's table and made physical contact with Nixon to nudge him out of the way. (*Id.* ¶). This contact was accompanied by Sina telling Nixon that "because [Nixon] had complained about [Sina] to Newman, [Sina] would make sure [Nixon] did not get any work days." (*Id.*). Nixon alleges that Sina continued to threaten Nixon for the rest of the year and assign him to Table 25 for "running to Newman reporting Sina's behavior." (*Id.* ¶ 18). In December 2003, Nixon complained to Tommy Newman and Human Resources regarding Sina's threats, including a written complaint to Human Resources in late December 2003. (*Id.* ¶¶ 19, 21).

Nixon also complained that Russell Leach, a white dealer, called Nixon "kid" two to three times in March 2004. (*Id.* ¶ 32). Nixon found this comment demeaning because he was about ten years older than Leach and believed that "kid" is a modern equivalent of "boy" which is a racially derogatory name towards African-Americans. (*Id.* ¶¶ 32, 38). When Nixon

complained to Fahy about Leach's comments, Fahy said he did not "have time to bay-sit" and nothing further was done. (*Id.* ¶ 33). Other than Leach's "kid" remarks, there were no other racial remarks directed at Nixon during his employment at GNLV, including from customers. (Nixon Dep. 46:8–11).

Nixon also claims that he was wrongfully reprimanded for two guest complaints. First, a customer complained in August 2003 about Nixon's purportedly "rude" behavior, resulting in Nixon receiving a written warning. (Pl.'s Resp. Req. Admis., Set Three, at 4–5). In February 2004, Nixon received another written warning for the stated reason that a guest had complained about his behavior. (*Id.* at 7). Nixon believed that these customer complaints were "camouflage" for disliking him because he is black. (Nixon Dep. 43:5–44:22).

Nixon additionally complained of difficulty switching shifts with co-workers. Nixon learned that a co-worker who wanted to switch shifts with Nixon was unable to because she was told by either Fahy or Sina that "only certain people can switch" shifts. (Nixon Decl. ¶¶ 28–29).

Nixon alleges he was retaliated against for reporting these various instances of discrimination. In December 2003, GNLV suspended Nixon for the stated reason of violating GNLV's "Zero Tolerance Policy." (Pl.'s Resp. Req. Admis., Set Three, at 7). In April 2004, Nixon received a three-day suspension for GNLV's stated reason of unauthorized use of a cell phone in a public area. (*Id.* at 9). On April 21, 2004 Nixon resigned from GNLV, allegedly because he "could no longer tolerate the cumulative effect of the racial harassment and unwarranted discipline and suspensions." (*Id.*; Nixon Decl. ¶ 39).

### D. Eddie Mae Hunter

GNLV hired Eddie Mae Hunter as a casino dealer effective February 23, 2000. (Pl.'s Resp. Req. Admis., Set Four, ECF No. 98-3, at 3). Hunter is an African-American female.

(Hunter Dep. 127:4–9, May 9, 2008, ECF No. 76-42). Hunter complains of racial discrimination and retaliation while employed at GNLV.

On her first day of work, one of the shift managers, Kathy Garrison, called Hunter into an office and informed her she could not wear her hair in braids. (Hunter Dep. 101:1–18). When Hunter informed Garrison that the prohibition was discriminatory, Garrison promised to "find out" and "get back with [Hunter]" on the issue. (*Id.* at 101:20–102:2). Hunter ultimately was never required to remove her braids while employed at GNLV. (Pl.'s Resp. Req. Admis., Set Four, at 21).

In another incident, a female customer was speaking to her husband at Hunter's blackjack table and twice referred to a black man sitting at the table as "monkey." (Hunter Dep. 94:13–95:13). Hunter believes the comment was directed at her, too, because the female said "I need that other monkey back over here." (*Id.*). Hunter informed her supervisor, "Paul," of the incident at her next break. (*Id.* at 96:3–16). Hunter also informed Leonard Sina. (*Id.*). In response, Sina told Hunter that the wife and husband "were just ignorant," while Paul said he would "give them a bad rating." (*Id.* at 97:2–4).

On one occasion, Hunter accidentally bumped into a female co-worker when both were turning a corner in the dealers' room. (*Id.* at 97:11–14). The co-worker physically pushed Hunter off, rolled her eyes, and walked off. (*Id.* at 97:15–17). The co-worker was Asian. (*Id.* at 97:12). When Hunter informed Supervisor Jack Brooks of the incident, he told Hunter that "it's [Asian] culture to be rude." (*Id.* at 97:18–24). Hunter believed this comment to be racial and it offended her. (*Id.* at 110:20–24, 111:7–8). Hunter is not sure whether Brooks said anything to the co-worker about the incident and Brooks did not discuss the incident further with Hunter. (*Id.* at 111:18–21).

In another experience, a co-worker "Phil" made negative comments about Al Sharpton to Hunter in the break room, offending Hunter. (*Id.* at 114:1–115:6). While Hunter does not remember the content of the exact comments, she does not think they were racial slurs. (*Id.* at 115:1–4). Hunter did not make a complaint to anyone regarding Phil's comments. (*Id.* at 115:20–21).

Hunter also complains that a supervisor named "Yolanda" once spoke with a customer from Mexico in Spanish while looking at Hunter and making hand gestures, which Hunter understood to mean that the two were talking about her. (*Id.* at 111:22-112:7). Hunter was uncomfortable with Yolanda speaking about her in another language. (*Id.* at 112:7–12). Hunter believes Yolanda's conduct was racial because Yolanda was Mexican, Hunter was African-American, and Yolanda knew that Hunter did not speak Spanish. (*Id.* at 131:24–132:5). Hunter informed supervisor "Art" of this incident, and Hunter believes Art addressed the situation with Yolanda. (*Id.* at 112:18–113:3).

Last, Hunter complains of an incident involving supervisor David Tuttle where Tuttle called Hunter into his office and told her she had to quit her part-time job at Fitzgerald's casino or quit her job at GNLV. (*Id.* at 121:21–122:11). Hunter felt Tuttle's instruction singled her out because most other employees at GNLV had other jobs at other casinos. (*Id.* at 122:24–123:2). While Hunter considers Tuttle's conduct harassing, she is not sure whether it was because of her race. (*Id.* at 126:17–127:19). Hunter continued to work at both jobs after confirming with GNLV's Human Resources that she was permitted to have another outside job. (*Id.* at 123:14–21).

Hunter admits to never making a complaint of harassment by customers or co-workers to Human Resources or Employment Relations at GNLV. (Pl.'s Resp. Req. Admis., Set Four, at 19–20). Hunter submitted a letter of voluntary resignation on or around March 15, 2005. (*Id.* at

8). In the letter, she stated, "I truly enjoyed working at the Golden Nugget and being a proud member of the team." (*Id.*).

### E. Dorothy Blake

GNLV hired Dorothy Blake effective September 23, 1998 as a blackjack dealer. (Pl.'s Resp. Req. Admis., Set Five, ECF No. 68-2, at 4). GNLV terminated Blake on or around November 15, 2004, with Blake's last day working at GNLV in May 2004. (*Id.* at 5; Blake Dep. 32:3–5, May 13, 2008, ECF No. 76-32). Blake claims she was sexually harassed and discriminated against because she is African-American. (Blake Dep. 117:11–22).

Blake complains that a supervisor, "Gisela" would call over male pit managers to see women's artificial breasts and then the pit managers would "gawk" at these women and talk about their breasts. (Blake Dep. 75:13–23, 85:6–17). On about ten occasions, another female supervisor, Carol Andreason, would make sexual gestures and converse with Blake about sex, embarrassing Blake. (*Id.* at 75:24–76:7, 164:8–10). Blake told Andreason she was embarrassed and asked her to stop and Andreason would thereafter call Blake a "prude." (*Id.* at 75:24–76:7, 163:20–24).

On about ten occasions, supervisors Gisela and James Gelfo would hug, kiss, and pat each other's rear ends in the pit. (*Id.* at 76:7–13, 84:22–85:3). While this conduct made Blake uncomfortable, Blake did not report it because they were supervisors and Blake liked Gisela and did not want to get her in trouble. (*Id.* at 86:2–7).

One time in mid-2002 during 15 minutes of downtime in the pit, a supervisor "Lisa" drew a man on a rating slip with a large penis and laughed and joked with the floor supervisor about how she wanted a man with a penis that size. (*Id.* at 76:14–25, 82:14–19, 102:13–17). Blake found the incident offensive but did not report it because it was a supervisor and Blake did not

want to lose her job. (*Id.* at 103:5–15). Richard Freeman had told Blake to "be careful" about what she complained about "because she might end up in the mail room." (*Id.* at 103:16–24).

Sometime in 2001 or 2002, a male customer told Blake that he would like to take Blake out and "eat [her] pussy." (Pl.'s Resp. Req. Admis., Set Five, ECF No. 68-2, at 23). The male customer made comments to this effect about three times while playing at Blake's table. (Blake Dep. 90:3–8, ECF No. 68-3). Blake called out to supervisor Carol Andreason across the pit to get her attention and told her she needed to "come over here and get this man, because he's talking out of line." (*Id.* at 91:7–9). Andreason said, "You can handle it. You're a big girl." (*Id.* at 91:13–15). Blake did not tell Andreason the particular comments that the customer had said to her at this time. (*Id.* at 91:21–24). Blake continued to deal to the customer for 20 more minutes. (*Id.* at 92:16–19). When Blake went on break, she told Andreason the exact words the customer told her. (*Id.* at 92:20–24). When Blake returned from the break, the customer was still at her table and played for another 30 minutes. (*Id.* at 94:10–12). Andreason and Leonard Sina both came to stand by Blake's table for a few minutes and the customer's vulgar comments ceased. (*Id.* at 94:10–16, 96:7–9, 96:10–20). Blake believes Andreason and Sina handled the situation improperly and thought they should have removed the customer from Blake's table. (*Id.* at 97:16–21). Blake did not report this incident to Human Resources. (*Id.*).

Blake also witnessed several supervisors, including Jack Brooks, James Gelfo, and Leonard Sina, comment on "how hot women were" and talk about "want[ing] to take them home." (*Id.* at 158:9–25). On about 15 occasions, Gelfo used graphic words to describe how he would satisfy women in bed but Blake could not recall the exact words. (*Id.* at 159:1–25, 162:6). Supervisor "Todd" also made comments about women's anatomy and talked about what "he [was] going to do to them" on about five to ten occasions. (*Id.* at 165:7–25, 166:13–15, 167:16–

23). When Blake told Todd his comments made her uncomfortable, Todd laughed. (*Id.* at 166:16–21).

Blake believes she was also racially discriminated against at GNLV. (*Id.* at 125:6–126:4). She believes she was discriminated against on the basis of her race by being assigned to work the "Big Six" game for more than six months after she was hired, because there were other dealers that could have been assigned to the game but were not. (*Id.*). Blake also observed several white dealers that were hired after Blake and were immediately given a schedule with Saturdays and Sundays off, while Blake had a standing request for that schedule and was denied the request for over six months. (*Id.* at 126:24–127:8, 128:20–129:4). Additionally, people hired after Blake received priority over Blake in the hours they worked. (*Id.* at 123:13–124:5). Blake specifically identifies a Caucasian woman who was given Blake's preferred schedule of 11:00 a.m. to 7:00 p.m. before Blake, even though she was hired after Blake. (*Id.* at 130:9–23). Blake also believes she was discriminated against by being assigned to the "Super Fun" game because she was the only African-American on that particular shift and was "always assigned to Super Fun." (*Id.* at 197:14–21). The Super Fun game was less desirable because it was difficult to deal the cards. (*Id.* at 198:6–13).

In 1998, Blake overheard Sina telling another African-American dealer that they only got their jobs because they are black or on welfare. (*Id.* at 116:21–117:10). Blake believes this comment was directed at her, too, because there was a large group of African-Americans, including Blake, hired at the same time. (*Id.* at 117:11–22).

One supervisor, "Kimberly," asked Blake about ten to twenty times if the black customers at Blake's table were her friends, when the customers were in fact not Blake's friends. (*Id.* at 124:6–19, 133:12–19). Kimberly did not ask whether a white customer at Blake's table was her friend when in fact the customer was Blake's friend. (*Id.*).

In another instance, Blake asked "Pamela," the acting pit manager, to go home early because she was ill. (*Id.* at 134:10–25). Pamela instructed Blake she may leave early with the implication that Blake would not receive any attendance "points." (*Id.*). Subsequently, GNLV assessed the points to Blake and did not remove the points from Blake's record until Pamela verified that no points should be assessed. (*Id.* at 135:1–136:5). Blake learned that another white employee, Valerie Funk, "[went] home all the time without a point." (*Id.* at 136:5–14).

Starting in March 2001, Blake received a series of attendance points, verbal counselings, and warnings as a result of absences from work. (Pl.'s Resp. Req. Admis., Set Five, at 5–7). From May 2003 to October 2004, GNLV granted a series of Blake's requests for leave and intermittent leave due to a medical condition associated with back issues. (*Id.* at 8–10). On or around November 1, 2004, after Blake failed to return to work from a medical leave of absence, GNLV placed Blake on a suspension pending investigation. (*Id.* at 10). Blake had a due process meeting with GNLV on November 5, 2004 where she expressed that she hoped to be able to reapply for her job because she enjoyed working at GNLV. (*Id.* at 11). Blake made no complaints of employment discrimination or harassment at this meeting. (*Id.*).

Blake admits to never complaining of harassment by customers, co-workers, or supervisors to Human Resources or Employee Relations during her employment at GNLV. (Pl.'s Resp. Req. Admis., Set Five, at 21–22). As of the date of Blake's deposition in May 2008, Blake had still not returned to work due to her medical condition. (Blake Dep. 32:9–11).

### F. Tequella Candice Smith

GNLV hired Tequella Candice Smith as a kitchen steward on August 1, 2002. (Smith Dep. 15:15–24, ECF No. 76-42). As a kitchen steward, Smith worked in multiple kitchens and locations at the GNLV property. (*Id.* at 26:17–20). Smith complains of sexual harassment, racial discrimination, and retaliation.

Smith complained of problems with supervisor Daniel Quintana "kissing on [her]" during the swing shift four or five times over a period of approximately one month. (*Id.* at 38:9–12, 40:18–23, 41:11–18). After she would return from a break, Quintana would "come to [her] station, and he would come get [her] and take [her] to the second floor where the banquets were . . . . [to] a ballroom storage closet . . . [a]nd he would kiss on [her]." (*Id.* at 38:22–39:4, 52:9–12). Quintana kissed Smith on the mouth and would touch Smith "[a]ll over [her] body." (*Id.* at 39:5–11). The first incident lasted about one hour and the incidents were unwelcome according to Smith. (*Id.* at 39:22–25). Smith was "scared" to try to leave the storage closet during these incidents because she "didn't know where to go." (*Id.* at 40:1–8). After about a month, Smith told Quintana she "didn't want him touching on [her]," and the incidents stopped. (*Id.* at 40:12–19). Smith talked to a shop steward, Albert Warner, about the incident but did not tell anyone else, including any supervisor, while employed at GNLV. (*Id.* at 42:17–21, 44:13–45:1). A shop steward is a worker that reports back to the union. (*Id.* at 36:20–24). Smith said she was afraid she would lose her job if she told anyone else. (*Id.* at 45:25–46:1, 47:14–18).

Smith also complained of problems with a co-worker, Michael Bada. In July of 2003, she alleges that Bada sexually harassed her by making comments to Smith and touching her rear end and chest in the buffet kitchen. (*Id.* at 101:18–23, 102:5–7). Bada touched Smith "whenever . . . [they] worked together" over a period of weeks. (*Id.* at 103:1–22). Smith reported this conduct to supervisor "Danny" and requested to be taken off the banquet kitchen assignment. (*Id.* at 109:23–110:3). Danny subsequently switched Smith to a different kitchen and Smith wrote a statement about the incident. (*Id.* at 110:4–8).

When Smith returned to the buffet kitchen after a period of about two to three months, Bada continued to bother Smith. (*Id.* at 124:3–6, 136:17–20). According to Smith, Bada would do things intentionally to "get under [her] skin" such as flipping over silverware, grabbing things

from Smith, and bumping into Smith. (*Id.* at 124:10–25). After this behavior continued for one to two weeks, Smith reported Bada's conduct to supervisors "William" and "Danny." (*Id.* at 134:11–15). Smith believes neither William nor Danny did anything about the situation. (*Id.*).

In another incident, Bada tried to take a dish rack from Smith. (*Id.* at 148:9–13). At one point, while Smith was lifting the rack, Bada touched Smith on her chest, leading to a physical altercation between the two. (*Id.* at 148:20–25). Smith ultimately threw a bus tub at Bada. (*Id.* at 151:2–4). Smith's written statement provided to GNLV made no allegation of Bada touching her chest. (*Id.* at 150:22–151:4). Smith also made no such allegation at a due process meeting discussing the incident. (*Id.* at 155:3–10). Smith was suspended for three days by GNLV for her involvement in this incident with Bada. (*Id.*). While Bada continued to engage in bothersome conduct such as flipping over silverware and interfering with dishes and glasses after Smith returned from her suspension, Smith did not report the conduct to any supervisors or Human Resources. (*Id.* at 163:5–16).

Smith also complains that a certain chef, whose name she cannot recall, made a comment to Smith while working the graveyard shift, saying that "I wish you will wash me the way you wash your silverware." (*Id.* at 56:13–23). Smith told supervisor Daniel Quintana about the incident. (*Id.* at 57:3–8). Quintana told Smith that he would "take care of it" and Smith believes he did because the chef never spoke to Smith again. (*Id.* at 57:9–13).

Another employee, Jon Pope, hugged Smith roughly but Smith did not believe Pope was trying to sexually harass her. (*Id.* at 90:20–25). However, Smith observed Pope make sexual comments to Lubertha Smith. (*Id.* at 92:24–93:5). Smith reported this conduct to supervisor Willy Johnson. (*Id.*).

Smith also complains of racial discrimination. First, Smith alleges that at the time she was hired, management told Smith that they were not sure she could wear her hair in braids and

in a black and burgundy color. (*Id.* at 180:15–24). Smith admits that she was never required to remove her braids while employed at GNLV. (Pl.'s Resp. Req. Admis., Set Six, ECF No. 70-6, at 20). Smith also contends that she was harassed by the security guards at GNLV. For example, Smith believes that they unnecessarily asked her to show her employee badge. (Smith Dep. 183:10–185:15). According to Smith, the security guards were generally "mean" to Smith and her African-American co-workers. (*Id.*).

Last, Smith alleges that manager Jay Bluhm directed Smith to stick her hands into soapy water to retrieve dishes knowing that she was allergic to the soap, which caused her to break out in a rash. (*Id.* at 205:19–207:10). Smith does not know if Bluhm was retaliating against Smith for complaining about the security guards. (*Id.* at 207:4–10).

Smith submitted a voluntary letter of resignation to GNLV on or about March 22, 2005. (Pl.'s Resp. Req. Admis., Set Six, at 10–11). Her last day of employment was April 5, 2005. (*Id.* at 11).

## II.    LEGAL STANDARDS

A principal purpose of the summary judgment rule is to "isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).  A court grants summary judgment only if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In making this determination, the court "must draw all reasonable inferences supported by the evidence in favor of the non-moving party." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  Rather, only genuine issues of *material* facts are relevant to the summary judgment analysis.  A fact is

material if it "might affect the outcome of the suit under the governing law." *Id.* at 248. "The moving party bears the initial burden of establishing the absence of a genuine issue of material fact." *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 531 (9th Cir. 2000). The burden is met by demonstrating to the court "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. This is done by citing to depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials. Fed. R. Civ. P. 56(c)(1)(A). Once the initial burden is met, however, "Rule 56(e) requires the nonmoving party to go beyond the pleadings and identify facts which show a genuine issue for trial." *Fairbank*, 212 F.3d at 531.

Moreover, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. This causes the moving party to be entitled to judgment as a matter of law because the nonmoving party failed to sufficiently show facts supportive of an essential element of the case for which she bears the burden of proof. *Id.* at 323. Conversely, where reasonable minds could differ on the facts proffered in support of a claim, summary judgment should not be granted, *Petzak v. Nevada ex rel. Dep't of Corr.*, 579 F. Supp. 2d 1330, 1333 (D. Nev. 2008) (Reed, J.). The nonmoving party may defeat summary judgment only if a reasonable jury might return a verdict in its favor based on evidence in the record, *Anderson*, 477 U.S. at 251–52, 257.

///

///

**III.    DISCUSSION**

The EEOC claims several employees at GNLV were subject to racially and sexually hostile work environments in violation of Title VII. Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000(e)-2(a)(1).  Discrimination can take the form of a negative employment action, or it may arise when an employer requires employees to work in a hostile or abusive work environment. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).[1]  Indeed, an employer violates Title VII when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment.'" *Id.* (internal citation omitted) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)). However, Title VII is not a "general civility code," *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 81 (1998), but instead protects individuals from workplace hostility based on certain characteristics (e.g., race, sex, or national origin), 42 U.S.C. § 2000e-2(a)(1). *See also Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998) ("[A] mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not sufficiently alter terms and conditions of employment to violate Title VII."); *Oncale*, 523 U.S. at 81 ("[Title VII] does not reach genuine but innocuous differences in the ways men and women routinely act with members of the same sex and of the opposite sex.").

To prevail on a hostile work environment claim under Title VII, the plaintiff must demonstrate that his or her workplace was permeated with discriminatory intimidation that was

---

[1] The same standards apply when reviewing hostile work environment claims based on racial harassment and sexual harassment. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 n.10 (2002). Thus, cases dealing with racial harassment can be instructive in cases dealing with sexual harassment, and vice versa.

sufficiently severe or pervasive to create an abusive working environment. *Brooks v. City of San Mateo*, 229 F.3d 917, 923–24 (9th Cir. 2000) (citing *Harris*, 510 U.S. at 21).  The working environment must be both "subjectively and objectively" perceived as abusive by the plaintiff. *Id.* (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995)).  Moreover, a court must consider the totality of the circumstances when determining whether the racial or gender hostility in a work environment is so severe or pervasive as to violate Title VII. *See McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1112–13 (9th Cir. 2004).  The alleged conduct need not cause mental harm, but it is enough "if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position." *Id.* (quoting *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1463 (9th Cir. 1994)).  While a single incident is usually insufficient to demonstrate a hostile work environment, if the harassment is more severe, there is less need for the plaintiff to show the pervasive nature of the conduct. *Brooks*, 229 F.3d at 926.

When evaluating the objective hostility of a work environment, the court considers a number of factors including the "frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *McGinest*, 360 F.3d at 1113 (quoting *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872 (9th Cir. 2001)); *see also Harris*, 510 U.S. at 23 (listing these factors).  Allegations of a racially hostile workplace "must be assessed from the perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff." *Id.* at 1115.  Likewise, allegations of a sexually hostile workplace are assessed from the perspective of the reasonable victim. *Brooks*, 229 F.3d at 924.

An employer's liability for harassing conduct varies according to whether the harasser is a supervisor, co-worker, or non-employee. *McGinest*, 360 F.3d at 1119; *Vance v. Ball State*

*Univ.*, 133 S. Ct. 2434, 2439 (2013). "In general, an employer is vicariously liable for a hostile environment created by a supervisor." *Nichols*, 256 F.3d at 877 (citing *Faragher*, 524 U.S. at 780). In situations where there is no tangible employment action against the plaintiff, the employer retains the affirmative defense that it "exercised reasonable care to prevent and correct" the harassing behavior, and "that the plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities." *Id.* (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998)). An employer is liable for a hostile work environment created by co-workers only if the employer "knew or should have known about the conduct and failed to stop it," amounting to a negligence standard. *Ellerth*, 524 U.S. at 759; *Vance*, 133 S. Ct. at 2441 (citing *Faragher*, 524 U.S. at 789). Ultimately, an employer's liability for the harassing behavior of a plaintiff's co-worker depends on the adequacy of the employer's response to reports of harassment. *See Ellison v. Brady*, 924 F.2d 872, 882 (9th Cir. 1991). Whether the employer's response was adequate depends on whether the remedy persuades "individual harassers to discontinue unlawful conduct." *Id.*

Finally, an employer may be liable for the harassing behavior of its customers and patrons "where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions." *Folkerson v. Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997); *see also Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1073–74 (10th Cir. 1998) (holding that an employer who "condones or tolerates" a hostile work environment should be liable regardless of whether the environment is created by co-workers or nonemployees). As with liability based on a co-worker's actions, an employer will be liable for a private individual's conduct only "when it knew or should have known of the conduct." *Folkerson*, 107 F.3d at 756. With these standards in mind, the Court now addresses whether each employee's claims survive GNLV's motions for summary judgment.

**A.  Robert Royal**

**1.  Hostile Work Environment—Race Discrimination**

To survive summary judgment on his hostile work environment claim based on racial discrimination, Royal must show that "(1) [he] was subjected to verbal or physical conduct of a [racial] nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive work environment." *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 892 (9th Cir. 2005).  There is no question as to whether Royal satisfies the first two prongs of this test.  Royal alleges that he was called names such as "nigger" and "blackie," and that he was threatened by individuals promising to "kick his black ass." (*See, e.g.*, VI Royal Dep. 171:1, 171:12–127:14, 182:10–18, 184:11–16).  However, the Court is not convinced that his allegations demonstrate that GNLV either created an abusive work environment or condoned harassing behavior.

The Court first addresses alleged harassment by Royal's supervisors. Royal alleges that in 2002 two different supervisors made the comment that "all blacks look alike" to customers at Royal's table as he and another African-American dealer exchanged places. (*Id.* at 305:8–20).  It is well-recognized that "[s]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1034 (9th Cir. 2005) (quoting *Faragher*, 524 U.S. at 788).  These two isolated incidents thus cannot support Royal's claims of racial discrimination by his Golden Nugget supervisors.  But even if these occurrences were enough to overcome summary judgment, the Court cannot find that GNLV is vicariously liable for the supervisors' actions because it may avail itself of an affirmative defense. *See Faragher*, 524 U.S. at 780; *Ellerth*, 524 U.S. at 765.

1    Royal only reported the first of the two incidents to his superiors at GNLV. (VI Royal

2    Dep. 306:25–308:3, 309:21–310:12).  The floor supervisor who had made the comment was

3    questioned regarding the incident and told not to speak that away again. (*Id.* at 306:25–308:3).

4    Royal was informed that the supervisor had been spoken to, and he acknowledges that GNLV

5    handled his complaint appropriately. (*Id.* at 307:22–308:3).  Accordingly, GNLV exercised

6    reasonable care to correct the harassing behavior. *See Nichols*, 256 F.3d at 877 (stating the first

7    prong of *Faragher/Ellerth* affirmative defense as employer's exercise of reasonable care to

8    prevent or correct harassment). Royal also failed to take advantage of any preventative

9    opportunities when he failed to report the second supervisor's comment. *See id.* (noting the

10   second prong of *Faragher/Ellerth* affirmative defense is employee's failure to exercise

11   reasonable care to take advantage of opportunities to prevent or correct harassment). Therefore,

12   Royal's allegations of discrimination at the hands of his supervisors are insufficient to

13   demonstrate a racially hostile work environment because GNLV corrected the harassing

14   behavior when it was reported and Royal unreasonably failed to report the other harassing

15   behavior.

16       The Court next considers the evidence of co-worker harassment. Royal identifies only

17   one co-worker who engaged in making racial comments and gestures towards Royal.  The

18   co-worker allegedly said to the customers at Royal's table on more than one occasion that "once

19   you give it to a black, you never get it back," after which he would grab Royal's buttocks. (VI

20   Royal Dep. 294:14–25).  After Royal reported this co-worker to his superiors, the co-worker was

21   eventually terminated, though not solely for his conduct directed at Royal. (*Id.* at 298:21–299:5).

22   Royal also received a letter from the Human Resources department thanking him for his report

23   and explaining that the co-worker no longer worked at the Golden Nugget. (*Id.*).  Under the

24   negligence standard, not only did GNLV address Royal's harassment claim once it became

1   aware of it, but it completely stopped this particular co-worker's conduct by firing him.

2   Therefore, GNLV cannot be liable on the basis that Royal's co-workers created a hostile work

3   environment.

4           The most egregious incidents of harassment that Royal suffered were by the customers at

5   GNLV.  Royal was called "nigger" on more than one occasion, and he heard customers use the

6   word at other times even when not directed at him. (*See, e.g.*, VI Royal Dep.  219:6–13, 184:11–

7   16, 232:18–233:1).  As courts have recognized, "[i]t is beyond question that the use of the word

8   'nigger' is highly offensive and demeaning, evoking a history of racial violence, brutality, and

9   subordination." *McGinest*, 360 F.3d at 1116. (quoting *Swinton v. Potomac Corp.*, 270 F.3d 794,

10  817 (9th Cir. 2001)).  If GNLV knew or should have known that customers were using such

11  language and nonetheless ratified or acquiesced to its usage, then it could face liability. *See*

12  *Folkerson*, 107 F.3d at 756.  However, by Royal's own account, each time Royal reported a

13  customer for using a racial slur or epithet, a supervisor responded by asking the customer to

14  leave Royal's table or, in the extreme case, calling security.

15          For example, in 1999 a customer used the word "nigger" during a game at Royal's table.

16  (VI Royal Dep. 166:7–169:10).  Royal reported the customer to his floor supervisor and the

17  supervisor "made the customer leave." (*Id.*).  The 2002 incident involving the customers who

18  referred to shooting dice with "niggers" also ended when Royal called over his supervisor. (*Id.* at

19  219:4–221:8).  The supervisor came to the table and the customers got up and left. (*Id.*).  In 2006

20  customers used the word "nigger" as they talked amongst themselves at Royal's table. (*Id.* at

21  190:15–191:8).  Royal reported the customers to the floor supervisor who then responded by

22  telling the customers the term was derogatory and asking them not to use it again. (*Id.*).  When

23  the customers continued to use the word, Royal called another supervisor over who eventually

24

1  called security, but by that time the customers had left Royal's table. (*Id.* at 195:9–196:23).

2  Royal believed that his supervisor properly responded to his complaint in this case. (*Id.*).

3  On other occasions, Royal did not report the customers' racist comments or conduct.

4  Although GNLV may be aware that customers are prone to racial harassment of its

5  African-American employees, it cannot respond to particular instances of racist behavior if it is

6  not informed of them. *Folkerson*, 107 F.3d at 756. In each instance where Royal reported the

7  harassing conduct, Royal was never subjected to harassment by the offending customer again.

8  (*See, e.g.*, VI Royal Dep. 221:1–22).  In fact, in most cases, Royal never even saw the customer

9  again. Thus, when the Court considers the totality of the circumstances relating to harassing

10  behavior by supervisors, co-workers, or customers, the Court does not find sufficient evidence to

11  overcome summary judgment that GNLV created or condoned a racially hostile work

12  environment during the ten years of Royal's employment. The Court therefore grants GNLV's

13  motion as to Royal's hostile work environment claim based on racial discrimination.

14  **2. Retaliation**

15  To establish a prima facie case of retaliation a plaintiff must show that (1) he was

16  engaged in an activity protected by Title VII, (2) his employer subjected him to an adverse

17  employment action, and (3) a causal connection exists between the two. *Manatt v. Bank of Am.*,

18  339 F.3d 792, 800 (9th Cir. 2003) (citing *Ray v. Henderson*, 217 F.3d 1234, 1240 (9th Cir.

19  2000)). If a plaintiff makes out a prima facie case, the burden shifts to the employer to advance

20  legitimate, non-retaliatory reasons for its actions. *See McDonnell Douglas Corp. v. Green*, 411

21  U.S. 792, 802 (1973). If the employer rebuts the presumption of retaliation, the plaintiff must put

22  forth "specific, substantial evidence" of pretext. *Collings v. Longview Fibre Co.*, 63 F.3d 828,

23  833–34 (9th Cir. 1995) (quoting *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)).

24  The EEOC argues that "as soon as Royal began complaining [of harassment], he rapidly began

1   receiving regular and increasingly severe disciplinary actions from management in the form of

2   his work history entries in his discipline log—many based on bogus customer complaints,

3   leading to counseling notices, a severe one day suspension without pay and the final denial of his

4   request to transfer." (Pl.'s Resp. Def.'s Mot. Summ. J., ECF No. 78, at 30). The unwarranted

5   discipline, according to the EEOC, constitutes retaliation in violation of Title VII.

6           Royal sent a letter on July 12, 2002 to Human Resources regarding an incident in June

7   2002 during which customers directed racial epithets towards Royal. (ECF No. 76-15). On July

8   30, 2002, Royal was verbally counseled for being "too sensitive" towards customers and

9   employees. (VII Royal Dep. 23:19–24:10). In September 2002, Royal received a verbal

10  counseling after a customer complained that Royal was rude and unfriendly. (*Id.* at 22:23–25,

11  23:1–18).

12          Complaining of workplace racial harassment is an activity protected by Title VII. 42

13  U.S.C. § 2000e-3(a). Discipline issued to an employee may constitute an adverse employment

14  action if it "materially affect[s] the compensation, terms, conditions, or privileges of . . .

15  employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (quoting *Chuang v.*

16  *Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1126 (9th Cir. 2000)). The Court doubts whether

17  the verbal counselings Royal received qualify as an adverse employment action. *See Nunez v.*

18  *City of L.A.*, 147 F.3d 867, 875 (9th Cir. 1998) (finding "harsh words" insufficient to constitute

19  an adverse employment action); *McCaw v. Potter*, 2006 WL 2520328, at *7 (D. Nev. Aug. 28,

20  2006) (Hunt, J.) (noting that public humiliation in the form of verbal constructive criticism does

21  not rise to the level of an adverse employment action). The record shows Royal's verbal

22  counselings were mere criticism that did not result in any written warning or suspension. Absent

23  any evidence that the verbal counselings materially affected the terms or conditions of Royal's

24  employment, the Court cannot find them to be adverse employment actions.

Royal received subsequent instances of discipline including a one-day suspension in February 2004, (*see id.* at 25), a verbal warning in 2006, (*see id.* at 28), and a written warning in 2007, (*see id.* at 31). Even if Royal could establish that these were adverse employment actions, Royal fails to submit evidence of a causal connection between his participation in an activity protected by Title VII and these instances of discipline. Royal argues that GNLV's actions were retaliatory and asks the Court to infer retaliatory intent. However, there is no evidence in the record from which the Court can infer GNLV's retaliatory intent beyond Royal's own speculation that the events were retaliatory. Moreover, the Court cannot infer retaliatory intent based on temporal proximity because the incidents are too far removed from Royal's July 2002 complaint about the customer directing racial epithets towards him. *See Porter*, 419 F.3d at 895 (concluding that temporal proximity "merely provides an evidentiary basis from which an inference of [retaliation] can be drawn"). Therefore, the later incidents of discipline cannot form the basis for Royal's retaliation claim and Royal fails to establish a prima facie case of retaliation.

The Court also notes that even if Royal could establish a prima facie case of retaliation, GNLV nonetheless rebuts the presumption with evidence of legitimate, non-retaliatory reasons for the discipline and Royal presents no evidence of pretext. Royal received a one-day suspension in 2004 for calling a customer a "cocksucker," (*see* ECF No. 63-2, at 25), a verbal warning in 2006 for "hustling tips" in violation of GNLV's policy, (*see id.* at 28), and a written warning in 2007 for signing for the wrong amount of chips, (*see id.* at 31). The Court is satisfied that these violations of work rules are legitimate reasons to discipline an employee. To show that GNLV's proffered reasons are pretext, Royal would need to show that either: "(1) . . . [GNLV's] proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or (2) . . . unlawful [retaliation] more likely motivated [GNLV]." *Noyes v. Kelly*

*Servs.*, 488 F.3d 1163, 1171 (9th Cir. 2007). Royal's "mere refutation" of GNLV's reasons for discipline, without further explanation, (*see* Pl.'s Resp. Mot. Summ. J., ECF No. 78, at 30–31), is insufficient to establish pretext. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 969 (9th Cir. 2001). Even the argument that GNLV's actions were "disproportionately severe" given Royal's alleged offenses is without supporting evidence. The Court therefore finds that Royal has failed to establish a prima facie case of retaliation, and even if he has, he has not established that GNLV's legitimate, non-retaliatory reasons for disciplining him are pretext. GNLV's motion as to Royal's retaliation claim is accordingly granted.

Therefore, GNLV's motion for summary judgment as to Royal (ECF No. 63) is GRANTED in its entirety.

**B. Susie Fein**

**1. Hostile Work Environment—Sexual Harassment**

To defeat GNLV's summary judgment motion, the EEOC must show that Fein "(1) was subjected to verbal or physical conduct of a sexual nature; (2) the conduct was unwelcome; and (3) the conduct was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." *Porter*, 419 F.3d at 892. Fein complains of the following instances of sexual harassment that she argues created a hostile working environment: (1) a co-worker and ex-boyfriend, Ray Allen, "stalked" her, stared at her, followed her around at work, and left notes and flowers for her, (Fein Dep. 48:22–49:14); (2) supervisor David Tuttle made romantic advances towards Fein including touching her hair, inviting her to a cabin, and telling her "how nice [she] looked," (*id.* at 55:18–58:21); (3) a customer named "Mr. Martini" kissed her on the lips multiple times, called her a "fucking cunt" about five times, called her a "fucking bitch" about 100 to 200 times, slapped her hands while she was dealing cards, and threw his cards at Fein on numerous occasions, (*id.* at 74:15–22, 77:1–7, 87:18–88:10, 94:1–13);

(4) a customer named "Joe" called Fein a "fucking bitch" about 100 times, threw cards at Fein about 25 times, (*id.* at 96:6–20, 97:11–13, 98:2–12); and (5) a customer "Mr. Hello" called Fein a "fucking bitch" about ten times and threw cards at Fein about ten times, (*id.* at 101:14–16, 105:19–106:4). The Court addresses each of these incidents in turn.

The Court first finds that each of the complained of incidents was of a sexual nature and each was unwelcome. *See Meritor*, 477 U.S. at 68 ("The correct inquiry is whether respondent by her conduct indicated that the alleged sexual advances were unwelcome, not whether her actual participation in [the conduct] was voluntary."). Accordingly, the Court must next consider whether, under the totality of circumstances, the conduct was so severe or pervasive so as to alter Fein's working conditions. *Harris*, 510 U.S. at 23.

Fein first complains of harassing conduct by Ray Allen, a former boyfriend and co-worker. Fein complained to supervisor Threet regarding Allen's conduct, and Threet immediately spoke to Allen. (Fein Dep. 50:6–51:4). The only conduct that persisted after Threet spoke with Allen was Allen's "staring" at Fein at work. (*Id.* at 51:8–21, 54:7–14). Thus, the only actionable conduct in regards to Allen's behavior towards Fein is his staring, because GNLV took action to stop the other inappropriate conduct. *See Ellison*, 924 F.2d at 882 (limiting employer liability for a co-worker's conduct that it knew or should have known about and failed to stop). Simply staring or leering at an employee is not sufficiently severe or pervasive to maintain a hostile work environment claim. *See, e.g.*, *EEOC v. Scolaris Warehouse Mkts., Inc.*, 488 F. Supp. 2d 1117, 1147 (D. Nev. 2007) (Erza, J.) (finding that allegation that manager "stared at [employee's] chest . . . a lot" was insufficient to maintain an individual claim for sexual harassment"); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1248 (11th Cir. 1999) (indicating that a supervisor's "following and staring" of employee, without more, is insufficient to maintain claim, especially when individuals work in the same area). Allen's conduct, on its own, cannot

1  support Fein's hostile work environment claim based on sexual harassment because it is not

2  sufficiently severe or pervasive.

3        Fein next complains of romantic advances by a supervisor, David Tuttle. Considering the

4  totality of circumstances, the Court finds that Tuttle's advances towards Fein were neither severe

5  nor pervasive. While it is true that conduct is even more egregious if perpetrated on the claimant

6  by a direct supervisor, mere inter-sexual flirtation and socializing in the workplace does not

7  create a hostile work environment. *Oncale*, 523 U.S. 75 at 81; *Craig v. M&O Agencies, Inc.*, 496

8  F.3d 1047, 1051 (9th Cir. 2007); *see also Weiss v. Coca-Cola Bottling Co.*, 990 F.2d 333, 337

9  (7th Cir. 1993) (finding supervisor's actions of asking plaintiff out on dates, calling her a "dumb

10  blonde," placing his hand on her shoulder several times, leaving "I love you" signs in her

11  workspace, and attempting to kiss her were not sufficiently severe or pervasive to create an

12  abusive working environment). The record contains no evidence that Tuttle's advances created

13  an abusive working environment for Fein. Therefore, Tuttle's conduct, on its own, does not

14  support Fein's hostile work environment claim.

15        The bulk of Fein's sexual harassment allegations stem from conduct by repeat customers

16  that played cards at her table. An employer may be liable for a third party's sexual harassment of

17  an employee if "the employer either ratifies or acquiesces in the harassment by not taking

18  immediate and/or corrective actions when it knew or should have known of the conduct." *Little*,

19  301 F.3d at 968 (quoting *Folkerson*, 107 F.3d at 756). While Fein complains of particularly

20  egregious comments directed towards her from customers including "fucking bitch" and

21  "fucking cunt" amounting to hundreds of separate comments, she failed to report these

22  comments to anyone and testified that she knows supervisors definitively heard these comments

23  only a few times. Fein testified in her deposition that supervisor "Del" heard Mr. Martini call

24  Fein a "fucking cunt" once and apologized to her for the comment. (Fein. Dep. 79:15–80:9). Fein

also testified that supervisor Robert Williamson responded to Martini calling Fein a "fucking bitch" by instructing Fein to bring a tape recorder to work. (*Id.* at 85:7–15). Last, Fein testified that a manager, "Maurice," heard "Joe" call Fein a "fucking bitch" while sitting at Fein's table "on more than one occasion" but does not specify how many comments Maurice heard. (*Id.* at 97:8–10).

Fein testified that she believes supervisors witnessed the rest of the customers' harassing conduct due to their proximity to her workspace in the pit, but admits she has no personal knowledge that the supervisors actually heard or witnessed the conduct. (*See, e.g.*, *id.* at 78:5–16, 81:9–82:16, 87:18–88:10, 94:1–13, 95:1–7, 98:2–4, 101:21–102:10).While most of the supervisors deny hearing these comments, supervisor James Gelfo testified that he thinks he may have heard these types of comments directed at dealers, but not Fein specifically, on about fifty occasions over the course of his twelve years employed at GNLV. (*See* Gelfo Dep. 70:25–71:7, 120:5–121:5–25, ECF No. 77-7).

While the evidence is thin that GNLV "knew or should have known" about the ongoing harassment of Fein by customers, *Little*, 301 F.3d at 968, especially considering that Fein never complained to Human Resources or Employee Relations about the incidents, (*see* Fein Dep. 105:19–106:4), the Court finds there is still a genuine dispute of fact on the issue. *See Anderson*, 477 U.S. at 249 ("[A]t the summary judgment state the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."). There is enough evidence in the record for a reasonable jury to find that Fein's supervisors heard the offensive comments and either ratified or acquiesced in the conduct or failed to take corrective action. A few comments spread out over almost three years of employment are neither severe nor pervasive. *See Harris*, 510 U.S. at 23 (distinguishing between a "mere offensive utterance" and conduct that is humiliating, abusive, and threatening);

*Dominguez-Curry*, 424 F.3d at 1034 (finding that "offhand comments" will not sustain a hostile work environment claim). However, when a plaintiff presents evidence that she was subject to hundreds of such comments, the totality of the circumstances could show severe or pervasive harassment amounting to an abusive working environment. The Court therefore finds a genuine issue of fact as to whether Fein suffered severe or pervasive sexual harassment as a result of constant offensive comments by customers and a genuine issue of fact as to whether GNLV knew or should have known about the comments. GNLV's motion as to Fein's hostile work environment claim is accordingly denied.

### 2. Retaliation

The EEOC also claims Fein was retaliated against in violation of Title VII when GNLV terminated her in 2002 and failed to rehire her in 2007. Fein's actions of both reporting workplace harassment, if proven, and participating in the instant litigation, are undoubtedly protected actions under Title VII. 42 U.S.C. § 2000e-3(a). Termination from employment is a quintessential adverse employment action, while failure to rehire can also constitute an adverse employment action. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1999). However, Fein's evidence of the last element, a causal connection between reporting harassment and an adverse employment action, is lacking. First, the EEOC provides no evidence that GNLV terminated Fein because of her complaints about sexual harassment. GNLV's stated reason for her termination was for repeated absences, which is what Fein also understood to be the reason for her termination. (Fein Dep. 140:19–23). Fein told GNLV at her due process meeting prior to her termination that she was having panic attacks causing absences, but she also told GNLV that she did not believe the panic attacks were job-related. (*Id.* at 125:23–126:2). At her deposition, Fein testified that her prior statement was false. (*Id.*). Fein also did not complain of any type of harassment at her due process meeting. (*Id.* at 140:24–141:9). The record shows that Fein was

terminated because of attendance issues, not because she reported workplace harassment, and Fein fails to create a genuine dispute of fact on the issue.

Fein also testified at her deposition that she thinks the reason GNLV did not rehire her in 2007 was because it knew of her participation in the instant litigation. (*See id.* at 148:5–10). Aside from Fein's speculation, there is no other evidence that GNLV, or Tuttle, who Fein communicated with in the re-application process, knew of Fein's involvement in this lawsuit at the time she sought to be rehired. Fein's allegations and speculative conclusions are not evidence of Tuttle's or GNLV's knowledge of her involvement in the litigation. *Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.") (citing *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995)). Making all reasonable inferences in favor of Fein, the record shows that GNLV refused to rehire Fein because she had previously been terminated for attendance problems. Fein fails to create a genuine dispute of fact on this issue. Therefore, the Court grants GNLV's motion as to Fein's claim for retaliation in violation of Title VII.

Therefore, GNLV's motion for summary judgment (ECF No. 64) as to Fein's hostile work environment claim is DENIED, while the motion as to Fein's retaliation claim is GRANTED.

### C. Ervin Nixon, Jr.

#### 1. Hostile Work Environment—Race Discrimination

Nixon complains that he suffered racial discrimination in the following ways: (1) he and other African-American dealers were not assigned to the Dice Pit and were instead assigned to less preferable games including "Table 25" while white dealers received the preferred work assignments, (Nixon Decl. ¶¶ 8, 9, 11, 26; Nixon Dep. 126:2–4); (2) Nixon received less work hours as compared to other part-time dealers with less seniority, and when Nixon complained to

a supervisor, nothing was done and he was retaliated against, (Nixon Decl. ¶¶ 12–13, 18–19, 21);
(3) a white co-worker called Nixon "kid" two to three times and when Nixon complained to a
supervisor, his supervisor did nothing and said that he did not have time to "baby-sit," (*Id.*
¶¶ 32–33, 38); (4) Nixon was reprimanded for two guest complaints reporting Nixon's "rude"
behavior, complaints Nixon believed were based upon Nixon's race, (Nixon Dep. 43:5–44:22);
and (5) Nixon learned that a co-worker was told by a supervisor that "only certain people can
switch" shifts, causing Nixon difficulty in switching shifts with co-workers, (Nixon Decl. ¶¶ 28–
29).

In order to maintain his hostile work environment claim based upon racial discrimination,
Nixon must first show that "[he] was subjected to verbal or physical conduct of a [racial]
nature." *Porter*, 419 F.3d at 892. Nixon presents no evidence that he was subjected to verbal or
physical conduct of a racial nature when he was given less desirable work assignments, when he
received fewer hours than other part-time dealers, when he was wrongfully disciplined for what
he believed to be racially-motivated guest complaints, and when a co-worker had difficulty
switching shifts with him. While Nixon himself perceives these incidents to be racially-charged,
his speculation is not enough to establish a hostile work environment. *Nelson*, 83 F.3d at 1081–
82. There must be objective evidence that racial harassment "pollute[d] [Nixon's] workplace."
*McGinest*, 360 F.3d at 112–13. The Court finds the record lacks evidence that these incidents
were racial in nature. Therefore, these incidents cannot support Nixon's claim for a hostile work
environment based on racial discrimination, although they may support a disparate treatment
claim, which the Court will address in the next section

Nixon's remaining evidence is that he was called "kid" two or three times by a co-worker
and that his supervisor ignored the complaint. Nixon believes that "kid" is the modern equivalent
of "boy," a racially derogatory name towards African Americans. (Nixon Decl. ¶¶ 32, 38).

According to Nixon, the fact that Nixon was about ten years older than the co-worker shows that the term was used as a racial slur. (*Id.*). The term "kid" may or may not have racial connotations in this case, and there is at least a genuine dispute of fact on this issue. Thus, the Court must analyze whether Nixon provided evidence that the conduct was severe or pervasive enough to alter his working environment. *Porter*, 419 F.3d at 892. The Ninth Circuit is clear that isolated epithets, even if racially or sexually derogatory, will not support the claim unless the comments create an abusive working environment. *Ellison*, 924 F.2d at 878. Aside from finding the comments irritating, there is no evidence in the record that Nixon's work environment became abusive as a result of a co-worker calling Nixon "kid" two or three times. Therefore, the Court grants GNLV's motion for summary judgment as to Nixon's hostile work environment claim because Plaintiff fails to produce enough evidence that Nixon was subjected to an abusive working environment.

### 2. Disparate Treatment—Race Discrimination

While not plead, the EEOC's allegations regarding GNLV's failure to assign Nixon and other African-American employees to the Dice Pit, GNLV's failure to give Nixon more hours, and Nixon's difficulties in switching shifts appear to more closely state a discrimination claim for disparate treatment rather than for hostile work environment. To establish a prima facie case of disparate treatment in employment conditions, Nixon must show that: "(1) [he] belong[ed] to a protected class, (2) [he] was performing according to [his] employer's legitimate expectations, (3) [he] suffered an adverse employment action, and (4) other employees with qualifications similar to [his] own were treated more favorably." *Noyes*, 488 F.3d at 1168 (quoting *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998)).

It is clear here that Nixon fails to make out a prima facie case of disparate treatment discrimination. Even though Nixon is a member of a protected class and even if he suffered

adverse employment actions through undesirable work assignments (although the Court is not

sure that he has), Nixon fails to put forth enough evidence to show that similarly situated

non-African-American employees were treated more favorably than him. *Hawn*, *Hawn v. Exec.*

*Jet Mgmt.*, 615 F.3d 1151, 1158 (9th Cir. 2010) (explaining burden on non-moving party to show

that the plaintiff is similarly situated to the employees allegedly receiving preferential treatment).

There is no evidence of Nixon's qualifications to work in the Dice Pit, receive more hours, and

switch shifts with other employees. Similarly, there is no evidence of the qualifications of the

white employees allegedly receiving preferential treatment. For example, Nixon was a part-time

employee at GNLV, (*see* Pl.'s Resp. Req. Admis., Set Three, ECF No. 65-3, at 3), and whether

the other employees allegedly receiving more favorable treatment were part-time or full time is

unknown. (*See* Nixon Dep. 126:125, ECF No. 65-2, at 22). It is Nixon's burden to show he is

similarly situated to the employees allegedly receiving preferential treatment in "all material

respects," and Nixon fails to do so. *See Moran v. Selig*, 447 F.3d 748, 755 (9th Cir. 2006);

*Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003) ("[I]ndividuals are similarly situated

when they have similar jobs and display similar conduct."). Without this evidence, the Court

cannot find that Nixon established that he was wrongfully treated differently to make out a prima

facie case of disparate treatment discrimination. *See Hawn*, 615 F.3d at 1159 (9th Cir. 2010)

(quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978)) (stating the "ultimate issue"

as "whether the employer is treating some people less favorably than others *because* of their

race") (emphasis added). Thus, GNLV's motion for summary judgment on a disparate treatment

theory is granted as to Nixon.

### 3. Retaliation

Nixon also claims he was retaliated against in violation of Title VII when GNLV

disciplined Nixon for illegitimate reasons. The Court finds the record contains evidence of

complaints by Nixon to GNLV about racial discrimination followed by instances of discipline against Nixon. The Court also finds the record replete with complaints by Nixon not based on race discrimination, which the Court will not consider for purposes of Nixon's retaliation claim.

In the spring of 2003, Nixon verbally complained to Tommy Newman that he felt he was being discriminated against on the basis of race by being assigned to less desirable locations in the casino. (Nixon. Decl. ¶ 11). In August 2003, Nixon received counseling notices for rudeness to customers and insubordination. (Nixon Decl. Ex. B-22, ECF No. 76-23; Nixon Decl. Ex. B-23, ECF No. 76-24). In January 2004, Nixon verbally complained that only white dealers were assigned to the Dice Pit. (Nixon Decl. ¶ 26). On February 18th, Nixon received a counseling notice for rudeness to customers. (Nixon Decl. Ex. B-27, ECF No. 76-28). In March 2004, Nixon complained to supervisor Art Fahy regarding co-worker Russell Leach's "kid" comments. (Nixon Decl. ¶ 33). The next day, Nixon received a counseling notice for being argumentative with a box person and supervisor. (Nixon Decl. Ex. B-29, ECF No. 76-30). On March 30, 2004, Nixon wrote a complaint to Human Resources on a form entitled "RACE HARASSMENT," complaining about his supervisors' failure to respond to his previous complaints. (Nixon Decl. Ex. B-30, ECF No. 76-31). On April 20, 2004, Nixon received a counseling notice and a three-day suspension for violating a cell phone policy prohibiting use in the public areas and for entering and exiting through a prohibited entrance. (Nixon Decl. Ex. B-32, ECF No. 76-33).

Assuming the proximity in time provides the required evidence of causation, *Porter*, 419 F.3d at 895, the Court finds the above-described incidents sufficient to establish a prima facie case of retaliation in violation of Title VII. In each instance, Nixon complained about racial discrimination and an incident of discipline against Nixon followed in a relatively short period of time. Thus, the burden shifts to GNLV to provide evidence of legitimate, non-retaliatory reasons for disciplining Nixon on these occasions. *McDonnell Douglas Corp.*, 411 U.S. at 802.

1   Addressing rudeness to customers, insubordination to supervisors, and violations of work rules

2   are appropriate reasons to discipline an employee, and GNLV meets its burden. Therefore, to

3   survive summary judgment, therefore, Nixon must provide specific and substantial evidence that

4   GNLV's reasons for disciplining him were pretextual. *Collings*, 63 F.3d at 833–34 (citing *Steckl*,

5   703 F.2d at 393).

6          Nixon may demonstrate pretext by either showing that GNLV's reasons for disciplining

7   him are not believable or by showing that retaliation more likely motivated the discipline. *Noyes*,

8   488 F.3d at 1171. The EEOC argues that GNLV's reasons for disciplining Nixon were pretextual

9   because:

> [m]any of the adverse actions taken against Nixon by Defendant were
> disproportionately severe for Nixon's alleged offenses. Ervin Nixon testified that
> other employees received lesser discipline for similar actions, leading him to think
> of these actions as retaliatory. Furthermore, Defendant has exhibited a complete
> failure to properly investigate the allegations before issuing the disciplinary
> actions, and never took Nixon's point of view into account.

(Pl.'s Resp. Mot. Summ. J., ECF No. 81, at 28). GNLV points out that these arguments are

without reference to evidence in the record, and that Nixon actually testified in his deposition

that "[he] wouldn't have knowledge of [other employees'] discipline." (Nixon Dep. 285:18–19,

ECF No. 102-2). The Court concludes that there is no evidence beyond the EEOC's arguments in

its briefing that other employees actually received lesser discipline for similar offenses.

Nonetheless, the Court cannot conclude that the record is completely devoid of evidence of

pretext.

       The Court focuses particularly on the evidence that Nixon received a counseling notice

*one day* after complaining about being called "kid" and received a *three-day* suspension for

violation of a cell-phone policy about three weeks after complaining to Human Resources on a

form entitled "RACE HARASSMENT." Sometimes, temporal proximity between the protected

activity and adverse action is enough to show pretext. *Bell v. Clackamas Cnty.*, 341 F.3d 858,

865–66 (9th Cir. 2003). The short period of time between events in Nixon's case, coupled with what seems like a potentially lengthy suspension, provides enough evidence such that a reasonable jury could find that GNLV's proffered reasons for disciplining Nixon were pretextual, and that the true motivation was retaliation. While Nixon did not submit evidence that he was disciplined more severely than other employees for similar offenses, GNLV also puts forward no evidence that it issues similar discipline to employees for similar offenses. The Court denies GNLV's motion as to this claim.

Therefore, the Court GRANTS GNLV's motion for summary judgment (ECF No. 65) as to Nixon's hostile work environment and disparate treatment claims and DENIES its motion as to Nixon's retaliation claim.

**D.  Eddie Mae Hunter**

Hunter's hostile work environment race discrimination claim is based upon the following incidents while employed at GNLV: (1) On Hunter's first day of work a shift manager questioned her ability to wear her hair in braids, although Hunter was ultimately never required to remove her braids at GNLV, (Hunter Dep. 101:1–18); (2) a female customer at Hunter's table referred to a black man as a "monkey" twice, and when Hunter complained to her supervisors, the supervisors said the customer was "ignorant" and promised to give the customer and the customer's husband a "bad rating," (*id.* at 95:13–97:4); (3) Hunter reported to her supervisor that an Asian co-worker was rude when bumping into her in a hallway and the supervisor told her that it was in the co-worker's culture to be rude, (*id.* at 97:11–24); (4) a co-worker made negative comments to Hunter about Al Sharpton but Hunter does not believe they were racial slurs and did not report the incident to anyone, (*id.* at 114:1–4, 115:20–21); (5) a supervisor spoke about Hunter in Spanish to a customer making Hunter uncomfortable, (*id.* at 111:22–112:12); and (6) Hunter felt supervisor David Tuttle singled her out, although not necessarily based on race, when

he informed her once that she had to quit her other part-time job (*id.* at 121:21–123:21; 126:17–127:19).

Most of Hunter's supporting evidence shows verbal conduct of a racial nature. *See Porter*, 419 F.3d at 892 (requiring verbal or physical conduct of a racial nature to sustain hostile work environment claim). However, Hunter's complaint about a co-worker making "negative," but not "racial," comments about Al Sharpton is not racial in nature. Likewise, Hunter's complaints regarding her supervisor speaking about Hunter to a customer in Spanish and Tuttle's incident of informing Hunter she must quit her job were not incidents of a racial nature. Therefore, these incidents cannot support Hunter's hostile work environment claim. The Court therefore must analyze the remaining incidents to determine whether they were unwelcome and, under the totality of circumstances, whether they were sufficiently severe or pervasive to create a hostile work environment. *Id.*

While the Court finds the remaining incidents were unwelcome to Hunter, the Court struggles to find a genuine issue of material fact as to whether the incidents were severe or pervasive. There is no evidence that these few comments spread out over Hunter's almost five years of employment created an abusive working environment. *Brooks*, 229 F.3d at 923–24 (citing *Harris*, 510 U.S. at 21). Even though a customer's conduct of calling an African-American man a "monkey" is racially offensive and egregious, and even if Hunter's supervisors did not respond appropriately to Hunter's complaint, the Court still cannot find this incident is sufficiently severe or pervasive to maintain Hunter's hostile work environment claim. *See Faragher*, 524 U.S. at 787 (finding that a "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not sufficiently alter terms and conditions of employment to violate Title VII"); *Ellison*, 924 F.2d at 878 ("[A]n isolated epithet by itself fails to support a cause of action for a hostile environment."). Her supervisors' comments cautioning

Hunter about her braids and noting that Asians have a "rude" culture are similarly offhand and isolated.

The Court therefore GRANTS GNLV's motion for summary judgment as to Hunter (ECF No. 66) because these few comments are not sufficiently severe or pervasive, as a matter of law, to sustain a hostile work environment claim based on racial discrimination.

**E. Dorothy Blake**

**1.  Hostile Work Environment—Sexual Harassment**

Blake's hostile work environment claim based upon sexual harassment is based on the following facts: (1) Blake witnessed a female supervisor call over male managers to discuss and "gawk" at women's breasts, (Blake Dep. 75:13–23, 85:6–17); (2) a female supervisor made sexual gestures and discussed sex with Blake, and when Blake asked her to stop and told her she was embarrassed, the supervisor called Blake a "prude," (*id.* at 75:24–76:7, 163:20–24); (3) a male and female supervisor would frequently hug, kiss, and pat each other's rear ends in the pit, (*id.* at 76:7–13, 84:22–85:3, 86:2–7); (4) one time a female supervisor drew a man with a large penis on a piece of paper and joked with another supervisor about the image and her sexual preferences, (*id.* at 76:14–25, 82:14–19, 102:13–17); (5) one time a male customer told Blake that he would like to take her out and "eat [her] pussy," and when Blake tried to call her manager over to deal with the situation she was told "You can handle it. You're a big girl." (*id.* at 90:3–8, 91:7–9, 91:13–15); and (6) male supervisors talked about sex and women's anatomy on multiple occasions in Blake's presence.

First, the Court addresses the single occasion where a customer made sexually offensive comments to Blake about wanting to take her out and "eat [her] pussy." The Court notes that GNLV will be liable for the customer's conduct only if it knew or should have known of the conduct and failed to take immediate corrective action. *Folkerson*, 107 F.3d at 756. In this

particular instance, Blake admits to not relaying the exact words the customer said to her when she first called out to a supervisor and instead relayed the message to "come over here and get this man, because he's talking out of line." (Blake Dep. 91:7–24). When Blake finally relayed the exact comments to her supervisors, the supervisors stood at Blake's table and the customer's vulgar comments ceased. (*Id.* at 94:10–16, 96:7–20). While Blake felt that the supervisors handled the situation improperly because they should have removed the customer from her table, (*id.* at 97:16–21), the Court finds the supervisors' response falls short of "condon[ing] or tolerat[ing]" the harassment to make GNLV liable for the customer's comments. *See Lockard*, 162 F.3d at 1073–74. Thus, even if the comments were severe or pervasive enough to create a hostile work environment, GNLV cannot be liable for the customer's misconduct because when Blake's supervisors learned of it, they addressed her complaint and stopped the harassment.

Next, the Court considers Blake's supervisors' comments and conduct. The Court finds all of the supervisors' comments and conduct to be unwelcome and of a sexual nature. *See Meritor*, 477 U.S. at 68. Thus, the remaining inquiries are whether, under the totality of circumstances, the conduct was sufficiently severe or pervasive to create a hostile work environment for Blake and whether GNLV can be liable for the conduct. *Porter*, 419 F.3d at 892; *McGinest*, 360 F.3d at 1119.

With the exception of being called a "prude" in response to asking a supervisor to stop discussions of a sexual nature, the bulk of Blake's complaints about her supervisors involve situations that Blake witnessed, but in which she did not participate. Witnessing harassing conduct can be enough to establish a hostile work environment claim even if the harassment was never aimed at the plaintiff. *See, e.g.*, *Day v. Sears Holdings Corp.*, 930 F. Supp. 2d 1146, 1194 (C.D. Cal. 2013) (noting that witnessing such conduct can affect perception of hostility of workplace). It is unclear in this case, however, whether observing the distasteful conversations

and conduct of her supervisors was sufficiently severe or pervasive to establish a hostile work

environment in Blake's case. Although there is evidence that Blake was embarrassed on a few

occasions, there is no evidence that the supervisors' behavior was physically threatening to Blake

or that it unreasonably interfered with her work performance. *See McGinest*, 360 F.3d at 1113.

The record instead shows that Blake observed the sexually-charged banter but the conversations

were rarely directed at Blake. "[I]ntersexual flirtation" and "offhand comments" are not the types

of conduct Title VII forbids. *Oncale*, 523 U.S. at 81. Even so, there is evidence in the record that

Blake's supervisors were aware that their comments embarrassed her and made her

uncomfortable but that the supervisors continued with their conduct in spite of Blake's protests.

Given that Blake was never threatened and that Blake herself was never the object of the

sexual jokes, the evidence is thin that Blake suffered from an abusive working environment as a

result of her supervisors' sexualized comments and behavior. *See Jenott v. St. Alphonsus Reg'l

Med. Ctr.*, 2009 WL 5200524, at *7 (D. Idaho, Dec. 23, 2009) (placing importance on the fact

that the harassing incidents were never aimed at the plaintiff). However, due to the volume of

alleged acts by her supervisors, Blake has at least created a genuine issue of material fact as to

whether she suffered from sufficiently severe or pervasive harassment to create a hostile work

environment. Thus, the Court moves on to analyze whether GNLV may avail itself of the

*Faragher/Ellerth* affirmative defense to avoid liability for Blake's supervisors' alleged sexual

harassment. *Nichols*, 256 F.3d at 877.

### 2. Faragher/Ellerth Affirmative Defense

Employers are vicariously liable for sexual harassment by supervisors, subject to the

*Faragher/Ellerth* affirmative defense. *Nichols*, 256 F.3d at 877. To avoid liability, GNLV must

show that it "exercised reasonable care to prevent and correct" the harassing behavior and that

Blake "unreasonably failed to take advantage of any preventative or corrective opportunities." *Id.*

(quoting *Ellerth*, 524 U.S. at 765). To establish the affirmative defense, GNLV relies on its sexual harassment policy and Blake's failure to report any of her supervisors' harassing behavior.

To establish the first prong of the affirmative defense, the employer must have "preventative and remedial measures" in place to address workplace harassment. *Hardage v. CBS Broad., Inc.*, 427 F.3d 1177, 1185 (9th Cir. 2005) (citing *Kohler v. Inter-Tel Techs.*, 244 F.3d 1167, 1180–81 (9th Cir. 2001)). Promulgation of an anti-harassment policy and efforts to disseminate the policy to employees demonstrate that the employer exercised reasonable care to prevent workplace sexual harassment. *Id.* (citing *Kohler*, 244 F.3d at 1181). However, if the employer did not exercise reasonable care to implement the policy to correct workplace harassment, the employer may still be liable. *See, e.g.*, *EEOC v. Braun Elec. Co.*, 2014 WL 1232212, at *7 (E.D. Cal. Mar. 24, 2014) (finding that employer failed to take reasonable corrective measures in two previous instances of harassment, negating the employer's affirmative defense). Reasonable corrective measures should stop the harassment complained of and deter others from engaging in harassing behavior. *Ellison*, 924 F.2d at 882.

The Court finds that GNLV satisfies the first prong of the *Faragher/Ellerth* affirmative defense by showing it had both preventative and corrective measures in place to address sexual harassment. GNLV promulgated and disseminated a policy prohibiting sexual harassment in written form, (ECF No. 68-5, at 16), and through in-person sexual harassment trainings, (Blake Dep. 62:25–63:2). The printed policy prohibits sexual harassment, which includes "physical [and] visual . . . sexually oriented" conduct by "hourly, salaried, supervisory and managerial" employees. (ECF No. 68-5, at 16). The policy defines sexual harassment as specifically including "when an employee tells sexually offensive or degrading jokes or stories," or "when an employee uses sexually oriented profanity, offensive gestures of a sexual nature, or makes

unwelcome comments about the appearance or anatomy of another." (*Id.*). The policy instructs

employees who have "experienced or *witnessed*" sexual harassment to report the behavior to

their supervisor, or if the employee is uncomfortable discussing the matter with the supervisor, to

report it to the Employee Relations or Human Resources departments. (*Id.*) (emphasis added).

The policy states that GNLV will investigate reports of sexual harassment and issue "appropriate

disciplinary action." (*Id.*). Last, the policy states that it prohibits retaliation against an employee

who reports sexual harassment. (*Id.*).

The Court is satisfied that GNLV, through its promulgation and dissemination of its

sexual harassment policy, exercised reasonable care to prevent workplace sexual harassment.

The Court also finds that GNLV exercised reasonable care to correct workplace harassment. In

Blake's case, the one time she complained of sexual harassment by a customer at her table,

Blake's supervisors came to her table and the harassment stopped. (Blake Dep. 94:10–16, 96:7–

20). Thus, concluding that GNLV meets the first prong of the *Faragher/Ellerth* affirmative

defense, the Court considers the second prong and whether Blake "unreasonably failed to take

advantage of any preventative or corrective opportunities." *Nichols*, 256 F.3d at 877.

Generally, an employee's "unreasonable failure to use any complaint procedure"

established by the employer will "suffice to satisfy the employer's burden" under the second

prong. *Ellerth*, 524 U.S. at 765. Blake signed a copy of GNLV's sexual harassment policy, (*see*

ECF No. 68-5, at 16), and attended in-person sexual harassment training at GNLV, (Blake Dep.

62:25–63:2). In her deposition, Blake admits to not complaining to anyone of her supervisors'

inappropriate and sexualized conduct. (*Id.* at 162:7–168:4). Blake testified that she did not

complain because it was her supervisors who engaged in the conduct and Blake "never thought

about" going to an assistant casino manager or casino manager to complain. (*Id.* at 107:8–18).

Blake also testified that a supervisor told her to "be careful" about complaining because "[she]

might end up in the mail room," which Blake understood to mean that she could not complain about sexual harassment. (*Id.* at 104:14–105:3). The Court finds that Blake's failure to report her supervisors' alleged sexual harassment was unreasonable. Blake's vague concern that she might "end up in the mail room," is unreasonable given GNLV's anti-retaliation provision in its sexual harassment policy. That she "never thought about" complaining to anyone besides her supervisors is unreasonable given the explicit instruction in GNLV's policy that allows employees to bypass their supervisors to report sexual harassment. The purpose of the second prong of the *Faragher/Ellerth* affirmative defense is to prohibit employees from recovering for those damages that could have been reasonably mitigated. *Faragher*, 524 U.S. at 806–07. Blake unreasonably failed to report workplace sexual harassment and mitigate her damages, thus establishing GNLV's affirmative defense. Therefore, the Court grants GNLV's motion for summary judgment as to Blake's claim for hostile work environment based on sexual harassment.

### 3. Hostile Work Environment—Race Discrimination

Blake's racially hostile work environment claim is based on the following facts: (1) Blake believes she was assigned to undesirable table games when other dealers could have been assigned to the games but were not, (Blake Dep. 125:6–126:4, 197:14–21); (2) white dealers were immediately given Saturdays and Sundays off, while Blake had to wait for over six months to receive this requested schedule, (*id.* at 126:24–127:8, 128:20–129:4); (3) employees hired after Blake, including white employees, were given preferred hours for work even though they were hired after Blake, (*id.* at 123:13–124:5, 130:9–23); (4) Blake overheard a supervisor telling another dealer that they only got their job because they are black or on welfare, (*id.* at 116:21–117:10); (5) one particular supervisor asked Blake about ten to twenty times if the black customers at her table were Blake's friends but did not ask whether white customers were her

friends, (*id.* at 124:6–19, 133:12–19); and (6) Blake received attendance points when she requested to go home early while a white employee "[went] home all the time without a point," (*id.* at 136:5–14).

Of these facts, the only incident that could support a hostile work environment claim based on racial discrimination is Blake's overhearing a supervisor say that the only reason African-Americans got their jobs at GNLV was because they are black or on welfare. All of the other incidents do not qualify as verbal or physical conduct of a racial nature. *Porter,* 492 F.3d at 892. While not supportive of a hostile work environment claim, these other incidents may support a disparate treatment claim, which the Court will discuss below.  The single isolated offensive comment about African-American employees being black or on welfare is not, as a matter of law, sufficiently severe or pervasive to create a hostile work environment. *Ellison*, 924 F.2d at 878; *Faragher*, 524 U.S. at 787 ("[A] mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not sufficiently alter terms and conditions of employment to violate Title VII."). Therefore, the Court grants GNLV's motion as to Blake's hostile work environment claim based on racial discrimination.

### 4. Disparate Treatment—Race Discrimination

Establishing a prima facie case of disparate treatment in employment conditions requires Blake to show she was performing according to GNLV's legitimate expectations and that GNLV treated other non-African-American employees with similar qualifications more favorably. *Noyes*, 488 F.3d at 1168 (citing *Godwin*, 150 F.3d at 1220). The bulk of Blake's evidence of disparate treatment centers on receiving less desirable work assignments, receiving fewer work hours, and being disciplined more than white employees. For example, Blake complains that white employees were immediately given Saturdays and Sundays off, while Blake had to wait for over six months to receive the same schedule. (Blake Dep. 126:24–127:8, 128:20–129:4).

Blake also complained that she received attendance points when she requested to go home early but hat a certain white employee "[went] home all the time without a point." (*Id.* at 136:5–14).

While Blake testified that GNLV gave preferential treatment to white dealers, Blake provides no other evidence to show that her qualifications were equal to or exceeded that of these dealers who allegedly received the preferential treatment. Without some evidence in the record, the Court cannot infer that Blake was "similarly situated" in "all material respects" to the white dealers at GNLV, which is required to make out a prima facie claim of disparate treatment discrimination. *Moran*, 447 F.3d at 755. Accordingly, the Court grants GNLV's motion as to Blake under a disparate treatment theory.

**5. Retaliation**

Blake claims two instances of retaliation in violation of Title VII. First, Blake argues that she was retaliated against by being assigned to a less desirable game after complaining to Pit Manager Richard Freeman about her work assignments. (*See* Pl. Resp. Def. Mot. Summ. J., ECF No. 83, at 28). Second, Blake argues she was terminated for her participation in this lawsuit. (*See id.*). As to Blake's first asserted instance of retaliation, the Court cannot find that Blake has presented evidence of a prima facie case of retaliation. A prima facie case requires showing a causal connection between Blake engaging in an activity protected by Title VII and GNLV's adverse employment action. *Manatt*, 339 F.3d at 800 (citing *Ray*, 217 F.3d at 1240). Blake complained to Freeman that the game she was assigned to was hurting her back. (Blake Dep. 104:1–12). Blake testified that Freeman responded by telling her to "be careful" about what she complained about "because she might end up in the mail room." (*Id.* 103:16–24). Blake did not engage in any activity protected by Title VII when she complained about her game assignment because she was not complaining about something that violates Title VII; in other words, Blake was not complaining about discrimination on the basis of her race, gender, religion, or national

origin. *See EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 963 (9th Cir. 2009) (concluding that complaining about discrimination based upon national origin and religion constitutes a "protected activity"). Therefore, there is no basis for a retaliation claim based upon GNLV allegedly giving Blake undesirable work assignments in response to Blake's complaint that a particular game was hurting her back, because Blake did not engage in any protected activity.

There is slightly more evidence to support Blake's theory that she was terminated for her participation in this lawsuit rather than for the stated reason of taking excessive medical leave. Blake spoke with the EEOC before being terminated in November 2004. (*Id.* at 170:22–171:9). Blake learned that GNLV knew of her involvement in the lawsuit prior to being terminated, although Blake cannot remember who told her these facts. (*Id.* at 171:6–172:2). Blake also learned from a co-worker that another employee that had taken more medical leave than Blake was not terminated. (*Id.* at 172:3–22). Assuming Blake can make out a prima facie case of retaliation, the burden shifts to GNLV to provide legitimate, non-retaliatory reasons for terminating Blake. *McDonnell Douglas Corp.*, 411 U.S. at 802. The Court finds that GNLV adequately rebuts the presumption with evidence of Blake's documented attendance issues including a series of attendance points, verbal counselings, warnings, leaves of absence, and a suspension pending investigation. (*See* Pl.'s Resp. Req. Admis., ECF No. 68-2, at 5–10). The attendance issues culminated in a due process meeting where Blake expressed that she hoped to be able to return to work but was unsure if she would be able to. (*Id.* at 11). Making all reasonable inferences in favor of Blake, the Court finds that the record supports that Blake was terminated because she failed to return to work from medical leave and was unsure if she would be able to return because of her medical condition. Given that Blake provides no specific and substantial evidence that GNLV's reasons for terminating Blake were pretext, *Collings*, 63 F.3d at 833–34, the Court grants GNLV's motion as to Blake's retaliation claim.

1    Therefore, the Court GRANTS GNLV's motion for summary judgment as to Blake (ECF

2   No. 68) in its entirety.

3    **F. Tequella Candice Smith**

4    **1. Hostile Work Environment—Sexual Harassment**

5    Tequella Candice Smith's claim for hostile work environment based upon sexual

6   harassment is based on the following facts: (1) over a period of about a month, a supervisor

7   would "come get [Smith]" and take her to a storage closet and "kiss on [her] and touch her all

8   over body, (Smith Dep. 38:9–39:11, 40:18–23, 41:11–18, 5:9–12); (2) a co-worker touched

9   Smith on her rear and chest while they worked together, (*id.* at 101:18–23); (3) a chef once told

10  Smith that "I wish you will wash me the way you wash your silverware," (*id.* at 56:13–23); and

11  (4) Smith witnessed a male co-worker make sexual comments to a female employee, (*id.* at

12  92:24–93:5).

13    The Court first addresses Smith's complaints about sexual harassment by co-workers.

14  GNLV will only be liable if it knew or should have known of the conduct and failed to stop it.

15  *Ellerth*, 524 U.S. at 759. Smith complained to her supervisors that a co-worker was harassing her

16  over a period of weeks when he would make comments to her inappropriately. (Smith Dep.

17  101:18–102:7). In response, Smith's supervisor accommodated her request to be assigned to a

18  different kitchen. (*Id.* at 109:23–110:8). When Smith returned to working with the co-worker, he

19  continued to bother her, but not sexually. (*Id.* at 124:3–25, 136:17–20). In a subsequent incident,

20  Smith claims the co-worker touched her on her chest again, but Smith failed to report this to

21  GNLV. (*Id.* at 148:20–25, 150:22–151:4). Accordingly, even if these incidents were severe or

22  pervasive enough to create a hostile work environment for Smith, GNLV will not be liable for

23  this co-worker's conduct because GNLV stopped the sexually harassing conduct that it was

24  made aware of.  GNLV cannot be held liable for the final incident of the co-worker touching

1  Smith's chest because Smith failed to report it and there is no evidence that GNLV should have

2  known about the incident.

3        In regards to the chef's comment to Smith about wanting her to "wash [him]" like the

4  silverware, Smith reported the incident to a supervisor and Smith believes the supervisor "[took]

5  care of" the situation because the chef never spoke to Smith again. (*Id.* at 57:9–13). The Court

6  finds that GNLV avoids liability for this chef's conduct because GNLV took action to stop the

7  harassment. Last, Smith complained about a male co-worker making sexually explicit comments

8  to a fellow female employee. (*Id.* at 92:24–93:5). Smith complained about the conduct to a

9  supervisor and recalls that the co-worker was required to talk with Human Resources about the

10  incident. (*Id.* at 96:7–11). There is no evidence that the conduct continued after the co-worker

11  was required to speak with Human Resources, but even if it did, the Court finds GNLV would

12  not be liable for creating a hostile work environment. The sexual comments were not directed at

13  Smith, and even if offensive, they were not sufficiently severe or pervasive to alter the terms and

14  conditions of Smith's employment and create an abusive working environment. *Oncale,* 523 U.S.

15  at 81; *Jenott*, 2009 WL 5200524, at*7–*8. Therefore, the Court finds that GNLV is not liable for

16  co-worker sexual harassment creating a hostile work environment for Smith.

17        Smith's evidence of supervisor sexual harassment, however, may impose liability on

18  GNLV. Smith's account of supervisor Daniel Quintana taking her to a storage closet on four to

19  five occasions over a period of a month to "kiss on [her]" and touch her all over her body is most

20  certainly physical conduct of a sexual nature. *Porter*, 419 F.3d at 892. Smith also testified that

21  the conduct was unwanted. (Smith Dep. 40:1–8, 40:12–19). Moreover, a reasonable jury could

22  conclude that such unwanted kissing and touching by a supervisor in a secluded storage area

23  could alter the terms and conditions of Smith's employment to create an abusive working

24  environment. The Court accordingly finds there is a genuine issue of material fact as to whether

the conduct was sufficiently severe or pervasive to create a hostile work environment for Smith. *Harris*, 510 U.S. at 21.

### 2. Faragher/Ellerth Affirmative Defense

While GNLV could be vicariously liable for Quintana's conduct if proven, GNLV may still avail itself of the *Faragher/Ellerth* affirmative defense at the summary judgment stage. *Nichols*, 256 F.3d at 877. To avoid liability, GNLV must show that it "exercised reasonable care to prevent and correct" the harassing behavior and that Smith "unreasonably failed to take advantage of any preventative or corrective opportunities." *Id.* (quoting *Ellerth*, 524 U.S. at 765). To establish the affirmative defense, GNLV relies on the policies in its employee handbook and Smith's failure to report Quintana's conduct.

First, GNLV must show it has "preventative and remedial measures" in place to address workplace harassment. *Hardage*, 427 F.3d at 1185 (citing *Kohler*, 244 F.3d at 1180–81). Promulgation of an anti-harassment policy and efforts to disseminate the policy to employees demonstrate that the employer exercised reasonable care to prevent workplace sexual harassment. *Id.* (citing *Kohler*, 244 F.3d at 1181). However, if the employer did not exercise reasonable care to implement the policy to correct workplace harassment, the employer may still be liable. *See, e.g. EEOC v. Braun Elec. Co.*, 2014 WL 1232212, at *7 (E.D. Cal. Mar. 24, 2014) (finding that employer failed to take reasonable corrective measures in two previous instances of harassment, negating the employer's affirmative defense). Reasonable corrective measures should stop the harassment complained of and deter others from engaging in harassing behavior. *Ellison*, 924 F.2d at 882.

The Court finds that GNLV satisfies the first prong of the *Faragher/Ellerth* affirmative defense by showing it had both preventative and corrective measures in place to address sexual harassment. As previously stated, GNLV promulgated and disseminated its anti-harassment

policy in written form through its employee handbook, (ECF No. 70-6, at 31), and through

in-person "zero tolerance" trainings, (Smith Dep. 58:23–59:17). The policy in the handbook

prohibited workplace harassment based on sex and advised employees the following regarding

reporting harassment:

> If you feel that you have experienced or witnessed harassment, you should discuss
> it with your supervisor or department head. If you are uncomfortable discussing
> the matter with your supervisor or department head, contact a member of the
> Employee Relations Department, Director of Human Resources, or the Vice
> President of Human Resources immediately. Do not let a problem fester . . . . If an
> investigation confirms that harassment has occurred, discipline will be imposed as
> appropriate.

(ECF No. 70-6, at 31–32). The handbook also advised employees that "victims of harassment

shall not be retaliated against in any way for making a complaint or cooperating in an

investigation." (*Id.* at 32). Smith testified in her deposition that she received and read the

employee handbook at or near the time she was hired and attended a "zero tolerance" training.

(Smith Dep. 58:23–59:17). Smith also testified that she understood that GNLV prohibited sexual

harassment of its employees and that an employee was to "tell [their] supervisor or someone

higher" if experiencing sexual harassment. (*Id.* at 61:17–24).

   GNLV also established that it had reasonable corrective measures to address sexual

harassment. Although GNLV was not made aware of the incidents involving Quintana until

Smith's deposition, the record shows that when Smith complained of sexual harassment on other

occasions, GNLV took action to stop the harassing conduct. When Smith complained about a

co-worker touching her rear end and chest, GNLV transferred Smith to work in another kitchen

per her request and promptly conducted an investigation. (*Id.* at 109:23–110:3, 113:17–115:12).

When Smith complained of a chef's inappropriate comments, Smith believes her supervisor

"took care of" the situation by speaking to the chef which led to the chef no longer speaking to

Smith. (*Id.* at 57:3–13). When Smith complained of a co-worker making inappropriate comments

1    to another female employee, the co-worker was required to speak with Human Resources. (*Id.* at

2    96:3–11). The evidence shows that GNLV was responsive to her complaints about sexual

3    harassment, and Smith fails to create a genuine dispute of fact on this issue.

4          Under the second prong of the *Faragher/Ellerth* affirmative defense, GNLV must show

5    that Smith unreasonably failed to take advantage of preventative or remedial measures.

6    *Faragher*, 524 U.S. at 806–07. The purpose of the second prong is to require the employee to

7    mitigate her damages and prohibit recovery of damages for what could have been avoided. *Id.*

8    Generally, an employee's "unreasonable failure to use any complaint procedure" established by

9    the employer will "suffice to satisfy the employer's burden under" the second prong. *Ellerth*, 524

10   U.S. at 765. GNLV argues that Smith's failure to report the incidents with Quintana was

11   unreasonable. Smith testified in her deposition that "[she] didn't tell anyone because [she] was

12   scared of losing [her] job." (Smith Dep. 47:14–15). Smith did not give any reason for her

13   subjective fears and admitted that she understood that sexual harassment was prohibited at

14   GNLV and that she was permitted to report problems to the Employee Relations or Human

15   Resources departments instead of her supervisors. (*Id.* at 47:20–48:4, 50:1–15). The Court finds

16   three Ninth Circuit cases instructive on whether an employee is unreasonable in failing to report

17   sexual harassment.

18          In *Holly D. v. Cal. Inst. of Tech.*, the court found that the plaintiff's delay in reporting

19   supervisor sexual harassment for two years after the first incident was unreasonable given that

20   written policy materials specifically identified numerous individuals that could receive and

21   process complaints. 339 F.3d 1158, 1178–1179 (9th Cir. 2003). Even though the plaintiff felt

22   uncomfortable in making the complaint with the employee relations department due to a

23   previous bad experience with a disability discrimination complaint, the plaintiff's failure to

24   explain why she did not seek help through the various other sources offered by the employer

established the employer's affirmative defense. *See id.* at 1179 (finding it unreasonable that the plaintiff "made no attempt to seek relief from any person able to help put a stop to the harassment").

In *Montero v. AGCO Corp.*, the plaintiff waited almost two years from the start of the alleged sexual harassment before complaining to the human resources department. 192 F.3d 856, 863 (9th Cir. 1999). The court found this delay to be unreasonable given the plaintiff knew about the policy prohibiting sexual harassment and knew who to contact if she was being subjected to sexual harassment. *Id.* In *Kohler v. Inter-Tel Techs.*, the plaintiff failed to tell anyone she had quit because of sexual harassment prior to initiating a lawsuit against the employer. 244 F.3d at 1181. The record showed that the plaintiff was aware of the policy prohibiting sexual harassment and that she was aware she could report harassment to management or the human resources department. *Id.* The court found the plaintiff's failure to report the harassment while working for the defendant was unreasonable. *Id.* at 1182.

Like in these cases, Smith's complete failure to report the harassment by Quintana was unreasonable. The record shows that Smith was permitted to bypass her immediate supervisors and managers and report the incident to Human Resources and/or Employee Relations if she felt more comfortable doing so. GNLV's employee handbook also reiterated an anti-retaliation policy, making her fear of being fired for reporting Quintana's conduct unreasonable. Smith fails to create a genuine issue of fact as to whether she was unreasonable in failing to report Quintana's conduct. Therefore, the Court finds GNLV has established an affirmative defense and grants its motion as to Smith's hostile work environment claim based upon sexual harassment.

### 3. Hostile Work Environment—Race Discrimination

Smith also alleges that she was forced to work in a hostile work environment based upon race discrimination. There are two factual allegations supporting this claim. First, Smith alleges

that when she was hired, she was told by GNLV's management that they were not sure she was

allowed to wear her hair in braids or in a burgundy color. (Smith Dep. 180:15–24). Second,

Smith believes she was harassed based on the fact that she is African-American when security

guards at GNLV would unnecessarily ask her and other minorities to show her employee badge.

(*Id.* at 183:10–185:15). There is no evidence other than Smith's suspicions that the guards'

actions of asking for badges were motivated by race. As such, these instances fall well short of

establishing a hostile work environment based on severe or pervasive conduct of a racial nature.

Therefore, the Court grants GNLV's motion as to Smith's claim for a hostile work environment

based on race discrimination.

### 4.  Retaliation

Smith claims GNLV violated Title VII when it issued her unwarranted discipline. Three

instances of discipline form the basis for Smith's retaliation claim. First, the EEOC argues that

Smith was retaliated against by being suspended for one day after first complaining that Bada

inappropriately touched her in July 2003. (*See* Pl.'s Resp. Def. Mot. Summ. J., ECF No. 85, at

9). The Court rejects this argument as Smith herself testified that she was not suspended at all for

this incident. (Smith Dep. 258:8–17). Second, the EEOC argues that Smith was retaliated against

when she was suspended for three days for throwing a bus tub at Bada and engaging in a

physical altercation with Bada after complaining that Bada was sexually harassing her. (*See* Pl.'s

Resp. Def. Mot. Summ. J., ECF No. 85, at 9). Again, the Court rejects this argument because

Smith testified that she did not notify GNLV of any sexually offensive conduct by Bada leading

up to the altercation and therefore could not be retaliated against for complaining that Bada was

sexually harassing her. (Smith Dep. 150:22–151:4; 155:6–10).

Third, the EEOC argues that Smith was retaliated against when she was suspended for

five days for using her cell phone to call her brother to tell him about Bada groping her breast.

(*See* Pl.'s Resp. Def. Mot. Summ. J., ECF No. 85, at 10). Smith testified in her deposition that she told at least one supervisor of Bada's conduct before being suspended. (Smith Dep. 174:13–23). The EEOC argues that the disciplinary actions taken by GNLV, including the five day suspension for Smith's cell phone policy violation "were disproportionately severe for Ms. Smith's alleged offenses since Ms. Smith was merely protecting herself from Bada's egregious sexual conduct toward her, and Defendant has exhibited a complete failure to properly investigate the allegations before issuing the disciplinary actions." (Pl.'s Resp. Def. Mot. Summ. J., ECF No. 85, at 28). GNLV argues that the discipline was appropriate, considering Smith violated GNLV's cell phone policy and that Smith allowed dishes to break while she left her work station to use her cell phone. (*See* ECF No. 76-49). Smith denies she allowed any dishes to break during this incident. (Smith Dep. 176:17–24).

To make out a prima facie case of retaliation, there must be evidence in the record that: (1) Smith engaged in an activity protected by Title VII, (2) GNLV subjected Smith to an adverse employment action, and (3) a causal connection exists between the two. *Manatt*, 339 F.3d at 800 (citing *Ray*, 217 F.3d at 1240). The Court finds that Smith establishes that she engaged in a protected activity when she told a supervisor about Bada's conduct leading up to her use of the cell phone and that GNLV's five-day suspension suffices as an adverse employment action. Smith also establishes a causal connection between the two events for purposes of making out a prima facie case of retaliation because of the close proximity in time between her complaining about Bada and her suspension, *Porter*, 419 F.3d at 895, as it appears that the incident and suspension occurred on the same day, (*see* ECF No. 76-49).

Because Smith makes out a prima facie case of retaliation, the burden shifts to GNLV to advance a legitimate, non-retaliatory reason for the discipline. *McDonnell Douglas Corp.*, 411 U.S. at 802. The Court finds that GNLV meets this burden because the proffered reasons for

Smith's suspension, violation of a work rule prohibiting use of cell phones while working and allowing dishes to break, if proven, are legitimate and non-retaliatory. Thus, the burden shifts back to Smith to put forth "specific, substantial evidence" of pretext. *Collings*, 63 F.3d at 833–34 (quoting *Steckl*, 703 F.2d at 393). Smith may demonstrate pretext by showing that GNLV's reasons for disciplining her are false or by showing that retaliation more likely motivated GNLV. *Noyes*, 488 F.3d at 1171. Sometimes, temporal proximity between a protected activity and the adverse employment action is enough to show pretext. *Bell*, 341 F.3d at 865–66.

Viewed in the light most favorable to Smith, the evidence in the record shows that Smith told a supervisor that Bada groped her breast and that this is the reason she left her work station to use her cell phone. Contemporaneously, Smith was suspended for five days. A reasonable jury could conclude that the suspension was disproportionately severe and pretext for retaliation against Smith, considering that the reason Smith claims she left her workstation was because Bada groped her breast. GNLV's motion as to Smith's claim for retaliation therefore is denied.

Smith also claims she was retaliated against by manager Jay Bluhm when he directed her to stick her hands in soapy water to retrieve dishes knowing of her allergies to the soap after she had reported discriminatory conduct by the security guards. (*See* Smith Dep. 205:19–207:10). Even if Smith could establish a prima facie case of retaliation for this incident, the Court finds that GNLV successfully rebuts the presumption with evidence that the reason Bluhm gave the instruction to Smith was because that particular work station was understaffed and dishes needed to be retrieved immediately. (Smith Dep. 200:1–7, 206:23–207:3). The Court finds this reason to be legitimate and non-retaliatory. Smith fails to provide any evidence that these proffered reasons are pretext. Accordingly, Bluhm's conduct will not support Smith's claim for retaliation. In sum, GNLV's motion for summary judgment of Smith's retaliation claim is denied with respect to the allegations regarding Smith's suspension for violating the cell phone policy.

1    Therefore, the Court GRANTS GNLV's motion for summary judgment (ECF No. 70) as

2  to Smith's claim for hostile work environment and DENIES the motion as to Smith's claim for

3  retaliation.

4  ///

5  ///

6  ///

7  ///

8  ///

9  ///

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24

**CONCLUSION**

IT IS HEREBY ORDERED that Defendant's motion for summary judgment as to Robert Royal (ECF No. 63) is GRANTED.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment (ECF No. 64) as to Susie Fein is GRANTED in part and DENIED in part. The motion as to the hostile work environment claim is DENIED, but the motion is GRANTED as to Fein's retaliation claim.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment (ECF No. 65) as to Ervin Nixon Jr. is GRANTED in part and DENIED in part. The motion is GRANTED as to the hostile work environment and disparate treatment claims, but it is DENIED as to Nixon's retaliation claim.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment as to Eddie Mae Hunter (ECF No. 66) is GRANTED.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment as to Dorothy Blake (ECF No. 68) is GRANTED.

IT IS FURTHER ORDERED that Defendant's motion for summary judgment as to Tequella Candice Smith (ECF No. 70) is GRANTED in part and DENIED in part.  The motion is GRANTED as to the hostile work environment claim, but it is DENIED as to Smith's retaliation claim.

IT IS SO ORDERED.


Dated:  Dated this 18th day of December, 2014.

_____
ROBERT C. JONES
United States District Judge